**SAN ANTONIO CREDIT UNION d/b/a SACU and Dennis E. Jennings and Kimberly Jennings, Appellants,**

v.

**Timothy D. O'CONNOR and Laco Development, Inc. d/b/a Laco Construction Co., Appellees.**

No. 04-00-00714-CV.

Court of Appeals of Texas, San Antonio.

July 2, 2003.

Rehearing Overruled Aug. 25, 2003.

R. Dwayne Danner, Irving, for Appellant.

Frank Oliver, Frank Oliver, P.C., Austin, for Appellant.

Gordon O. Stafford, Jr., Burns, O'Gorman, Black & Weyland, L.L.C., San Antonio, for Appellant.

Sharon E. Callaway, Michael J. Murray, and Jacqueline M. Stroh, Crofts & Callaway, P.C., San Antonio, for Appellant.

David B. West and William F. Hulse, IV, Cox & Smith Inc., San Antonio, for Appellant.

Gerald T. Drought and Denise Nixon Bunk, Martin, Drought & Torres, Inc., San Antonio, for Appellee.

Sitting: CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice.

Opinion by KAREN ANGELINI, Justice.

On December 12, 2002, Timothy D. O'Connor and Laco Development, Inc. d/b/a Laco Construction Company filed a motion for rehearing of our opinion that issued on November 27, 2002. *See San Antonio Credit Union v. O'Connor*, No. 04–00–00714–CV, 2002 WL 31662054 (Tex. App.-San Antonio Nov. 27, 2002). On December 27, 2002, Dennis E. Jennings and Kimberly Jennings also filed a motion for rehearing. On January 30, 2003, we ordered all parties to file responses to both motions for rehearing. After consideration of the responses of the parties, we deny both motions for rehearing. We do, however, withdraw our prior opinion in this matter and substitute this opinion in its place. The judgment remains unchanged.

This is an appeal from a judgment rendered in favor of Timothy D. O'Connor and Laco Development, Inc. d/b/a Laco Construction Company. San Antonio Credit Union challenges the sufficiency of the evidence supporting the jury's conspiracy finding, which rendered it jointly and severally liable with the Jennings for defamation and intentional infliction of emotional distress. It also challenges the jury's breach of contract findings. Dennis E. and Kimberly Jennings likewise challenge the jury's breach of contract, defamation, intentional infliction of emotional distress, and malicious prosecution findings, arguing the findings are unsupported by legally and factually sufficient evidence. Both SACU and the Jennings challenge the

jury's award of attorney's fees and the trial court's submission of the damages questions to the jury. For the reasons set forth below, the trial court's judgment is affirmed in part, reversed and remanded in part, and reversed and rendered in part.

FACTUAL & PROCEDURAL HISTORY

On July 7, 1992, Dennis and Kimberly Jennings entered into a Builder's and Mechanic's Lien contract with Laco Construction Company ("Laco") to construct a residence for $158,212.00. A month later, the Jennings, Laco, and San Antonio Credit Union ("SACU") entered into a Construction Loan Agreement ("CLA"). Under the terms of the CLA, SACU loaned the Jennings $155,200.00 for construction of the residence. The difference between the bid price and the loan amount was to be paid by the Jennings.

Pursuant to the CLA, once a certain phase of construction was completed, O'Connor, on Laco's behalf, would complete an SACU Construction Draw Sheet and present it to the Jennings, who would then sign it and return it to SACU. SACU would then send an inspector out to review the completed work and, based upon the inspector's approval, SACU would issue a check to Laco for the amount of the draw. The CLA provided that SACU would keep 10% of the draw as retainage. According to O'Connor, he and Dennis Jennings agreed that SACU would waive the retainage requirement. SACU did not withhold the 10% retainage from O'Connor's first three draws, but it did withhold varying percentages from each of the remaining draws.

Once construction on the house had begun, the Jennings and Laco agreed to add "extras" to the house at the Jennings' expense. Laco periodically requested draws from SACU. At some point during con-

struction, Laco fell behind on payments owed to subcontractors because, according to O'Connor, the Jennings had not paid for the "extras" as promised, because SACU retained 10% of each draw in spite of the agreement between O'Connor and Jennings that it would not, and because of a lumber theft from the job site.

On December 7, 1992, Jim Potter, a SACU officer, received a phone call from Guido Lumber, a Laco subcontractor, notifying him that Laco owed Guido Lumber $9,000.00 for lumber used for construction of the Jennings' house. Potter noted on the loan disbursement sheet "hold on draw" and "no more draws until this is resolved." On that same day, Guido Lumber sent the Jennings a letter informing them of the nonpayment and notifying them that if the account remained unpaid, a lien may be placed on the property. On December 8, 1992, Jennings, upon receipt of Guido Lumber's letter, instructed SACU to place a hold on the draws. According to both Potter and Jennings, they mutually decided to freeze the account. According to O'Connor, he went to SACU to pick up a draw he had submitted on December 8th and was told that Jennings had instructed SACU to freeze the draws.[1] Around the same time, Jennings began placing calls to subcontractors inquiring into the status of their accounts with Laco. None of the subcontractors had complained to Jennings about any delinquency until after he made the calls.

On December 18, 1992, the Jennings' attorney sent to O'Connor a letter notifying him that he had failed to satisfy his obligations under the construction contract, requesting that he extinguish all debts owed to subcontractors and man the construction site to finish construction of the residence. The letter further requested that O'Connor provide the attorney with a list of "all outstanding bills from subcontractors who have worked on the single-family residence and who have not been paid. . . ." O'Connor responded with a letter detailing the agreed-upon extras. On December 28th, O'Connor resubmitted a draw request, which was not paid because the account was still frozen.

On January 14, 1993, the Jennings' attorney sent a letter to O'Connor/Laco terminating the Builder's and Mechanic's Lien contract because Laco had failed to pay outstanding balances due to subcontractors. In closing, the letter stated:

> For your information, your misapplication of the funds received from the lender (SACU) is a very serious criminal offense. According to § 162.031 of the Texas Property Code you have committed a felony of the third degree. Our client intends to pursue this matter with the Bexar County District Attorney.

On January 22, 1993, upon the Jennings' attorney's request, SACU sent to the Jennings' attorney a memo summarizing a history of activity on the Jennings' loan. SACU sent the memo understanding that it would be shared with O'Connor's attorney. On January 25th, SACU received a letter from the Jennings' attorney informing it that the Jennings had terminated their contract with Laco and were in the process of completing the residence themselves. Attached to the letter was an estimate of expenses associated with completing the residence. SACU and the Jennings entered into a separate contract to complete the residence.

In August of 1993, Jennings filed a criminal complaint, alleging O'Connor misappropriated or embezzled funds. At trial, Jennings testified that SACU might have provided him with draw sheets and copies

1. SACU disputes the submission of any such draw request.

of checks issued to O'Connor. Jennings attached at least some of these documents as exhibits to his criminal complaint. In May of 1995, almost two years after the complaint had been filed, O'Connor was indicted for misapplication of funds. On June 6th, O'Connor was arrested at his home, incarcerated, and then released on bail. In October of 1995, O'Connor filed a motion to set aside the indictment, and the district attorney dropped the charges against him, but on the dismissal sheet noted "case to be reindicted." O'Connor was never reindicted.

O'Connor and Laco sued SACU and the Jennings under multiple theories of recovery. The jury found the following: that SACU and the Jennings each breached the CLA; that Dennis Jennings maliciously prosecuted and defamed O'Connor and intentionally inflicted emotional distress on him; and that SACU and Kimberley Jennings had conspired with Dennis Jennings to defame and intentionally inflict emotional distress on O'Connor. The jury awarded O'Connor actual and exemplary damages. The trial judge further imposed a constitutional lien on the Jennings' property in O'Connor's favor. SACU and the Jennings appeal.

## SUFFICIENCY OF THE EVIDENCE

### A. *Standard of Review:*

■ In multiple issues, SACU and the Jennings challenge the sufficiency of the evidence supporting the jury's findings. In assessing whether the evidence supporting a jury finding is legally sufficient, this court considers only the evidence favorable to the jury's decision and disregards all evidence and inferences to the contrary. *Davis v. City of San Antonio*, 752 S.W.2d 518, 522 (Tex.1988); *Thrift v. Hubbard*, 974 S.W.2d 70, 77 (Tex.App.-San Antonio 1998, pet. denied). If there is more than a scintilla of evidence to support

the finding, then the no evidence challenge fails. *Thrift*, 974 S.W.2d at 77. In considering a challenge to the evidence's factual sufficiency, this court reviews all of the evidence and reverses for a new trial only if the challenged finding shocks the conscience, clearly demonstrates bias, or is so against the great weight and preponderance of the evidence that it is manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Thrift*, 974 S.W.2d at 77.

### B. *SACU*

■ According to O'Connor, the Jennings and SACU "conspired by concerted action to effectuate the slander and intentional and reckless infliction of emotional distress that resulted in Plaintiff O'Connor's injuries and damages...." Specifically, O'Connor maintains that SACU acted in furtherance of the conspiracy by unlawfully withholding funds due to Laco for work that had been authorized and approved by the Jennings. These acts, according to O'Connor, gave Jennings a false factual basis for his slanderous statements and outrageous conduct. The jury found that SACU and Kimberly Jennings were part of a conspiracy that damaged O'Connor. Only SACU appeals the conspiracy finding, arguing that the finding is unsupported by legally or factually sufficient evidence.

■ Civil conspiracy is a derivative tort requiring proof of five elements: (1) two or more persons; (2) an objective to be accomplished; (3) a meeting of the minds on the objective; (4) one or more unlawful, overt acts in furtherance of the objective; and (5) damages as a proximate result. *Operation Rescue–Nat'l v. Planned Parenthood of Houston & Southeast Tex., Inc.*, 975 S.W.2d 546, 553 (Tex. 1998); *Ghidoni v. Stone Oak, Inc.*, 966 S.W.2d 573, 585 (Tex.App.-San Antonio

1998, pet. denied) (en banc). For the alleged conspirators to have a "meeting of the minds," there must be an agreement among them and each must have a specific intent to commit the act. *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex.1996) (citing *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983)); *Ghidoni*, 966 S.W.2d at 585. For specific intent to exist, the parties must be aware of the harm or the wrongful conduct at the beginning of the agreement and intend to cause that harm. *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 617 (Tex.1996); *Triplex Communications, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex.1995).

O'Connor relies on circumstantial evidence to support the jury's conspiracy finding. According to O'Connor, the evidence circumstantially proved "SACU's and Jennings' agreement to maliciously destroy or injure the business of [O'Connor] though a course of serious and troubling conduct." Viewing the evidence in a light most favorable to the jury's conspiracy finding against SACU, the evidence in this case is distilled this way: O'Connor, Laco, Jennings and SACU entered into two contracts for the construction of a house. O'Connor and Jennings agreed that SACU would not withhold retainage out of loan disbursements, although it was required under the contract and by statute. At first, SACU did not withhold any retainage from draws issued to O'Connor. Later, however, SACU refused to disburse the 10% retainage to O'Connor and instead, withheld a percentage of each draw. A SACU representative testified that the failure to initially withhold retainage was bank error. SACU paid inspection fees out of the loan proceeds rather than requiring Jennings to do so. Because SACU withheld the retainage in spite of O'Connor's and Jennings agreement and because of a low profit margin, extras added to the house, and a lumber theft, O'Connor got behind on his payments to subcontractors. After Guido Lumber called SACU and complained that O'Connor had not paid for lumber delivered to the construction site, SACU placed a hold on all draws from the Jennings' loan. The next day, Jennings and SACU agreed to freeze draws from the Jennings' account. The same day, O'Connor submitted a draw request, but was denied loan funds because of the freeze. Thereafter, SACU refused to meet with O'Connor and wrote draw checks payable to Jennings only rather than making them payable to Jennings and Laco jointly, as provided for in the contract. After Jennings terminated his contract with Laco, SACU refused to approve payment directly to Laco's subcontractors and released the funds to Jennings instead.

Although these facts, viewed in a light most favorable to the jury's verdict, demonstrate that Jennings and SACU agreed to terminate their contracts with O'Connor and Laco and to withhold loan proceeds from O'Connor, evidence of such an agreement does not give rise to an inference that SACU intended to harm O'Connor in the manner he suggests. *Juhl*, 936 S.W.2d at 644; *Ghidoni*, 966 S.W.2d at 585. SACU's retention of 10% of each requested draw does not give rise to an inference that, by doing so, SACU intended to harm O'Connor. The Texas Property Code requires owners to retain 10% of the contract price or the value of the work. Tex. Prop.Code Ann. § 53.101 (Vernon 1995). The CLA incorporated this requirement by providing that SACU, on the Jennings' behalf, would retain some portion of each advance, sufficient to ensure that by the time the full amount of the loan had been disbursed, 10% of the total amount would have been retained. Accordingly, SACU was required to withhold a portion of each draw. O'Connor contends, however, that

the parties could have waived the retainage provision and points out that the evidence shows Jennings agreed to waive any retainage. There is no evidence though that shows SACU agreed to or even had knowledge of O'Connor's and Jennings' agreement to waive the retainage requirement. Without knowledge of the agreement, we cannot infer that SACU disregarded it with the intent to defame and inflict emotional distress on O'Connor.

■ According to O'Connor, SACU acted in furtherance of the conspiracy by withholding all loan proceeds from him, first based upon a phone call from a subcontractor reporting a delinquent account and then based upon Jennings' instructions to freeze the account. Jennings testified that he and SACU made a "mutual decision" to freeze the account. From the fact that SACU and Jennings decided together to disallow O'Connor access to loan funds, we cannot infer that they did so to harm O'Connor. To accept O'Connor's argument that they did, this court would have to infer that they withheld the money, not because subcontractors were unpaid, but to further indebt O'Connor to other subcontractors. From that inference we would have to infer that Jennings used this "false" indebtedness as grounds for terminating Laco and filing a criminal complaint against O'Connor for misappropriation of funds. The underlying inference this court would have to engage in to support the jury's conspiracy finding is that SACU and Jennings, from the moment they froze the account, intended to defame and inflict emotional distress on O'Connor. "Vital facts may not be proven by unreasonable inferences or by piling inference upon inference." *Bradford v. Vento*, 997 S.W.2d 713, 728 (Tex.App.-Corpus Christi 1999), *rev'd in part on other grounds*, 48 S.W.3d 749 (Tex.2001). A chain of inferences, such as that O'Connor proposes here, can

only be stretched so far before it snaps. *Id.* O'Connor's argument "stretches the evidence past the breaking point." *Id.*

As support for his conspiracy theory of liability, O'Connor also relies on the fact that SACU paid inspection fees out of the loan proceeds, rather than requiring the Jennings to pay them. O'Connor contends that from this fact we can infer that SACU acted to reduce loan funds available to him and to give Jennings more factual ammunition for his criminal charges. A SACU loan officer testified that inspection fees can either be taken out of the loan or billed to the owner; however, there is a note in the file suggesting the Jennings should have paid the inspection fees. We cannot solely or reasonably infer from the fact that SACU, rather than Jennings, paid inspection fees that SACU intended to harm O'Connor by doing so. Although we could equally infer that SACU's payment of inspection fees was a mistake or even a regular business practice, any inference must be reasonable in order to amount to evidence. *See Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex.2001) (Phillips, C.J.).

SACU, *after* the contract with Laco was terminated, made payments to Jennings only and refused to pay Laco's subcontractors. Ultimately, SACU's actions caused a reduction in loan funds available to pay Laco for work performed. But from this outcome we cannot infer that SACU, all along, intended to harm O'Connor personally or professionally.

O'Connor relies on other circumstantial evidence to show that SACU engaged in a conspiracy with Jennings. The Jennings' attorney sent O'Connor a letter on December 18, 1992, which states "the San Antonio Federal Credit Union is very concerned about this situation and is contemplating what action it may take." Then in January of 1993, the Jennings' attorney

sent O'Connor another letter, which states "your misapplication of the funds received from the lender (SACU) is a very serious criminal offense." SACU denied any intent to independently file a criminal complaint and further denied aiding Jennings in filing his own complaint. Nevertheless, O'Connor argues that the jury could have reasonably inferred from these letters that SACU and Jennings were contemplating filing the criminal action. SACU provided Jennings documents from his file, knowing that he was going to file or had already filed a complaint with the district attorney's office. O'Connor argues that SACU provided the documents in furtherance of the prosecution. However, Christine Jacobs, SACU's corporate representative, testified that SACU would release documents of the same nature to any of their clients. There is no evidence suggesting that it was not SACU's general business practice to release loan-related documents to a borrower or that SACU otherwise participated in filing a complaint against O'Connor. And even if SACU had contemplated filing a criminal complaint against O'Connor, it would not amount to evidence that it intended to defame him by doing so. *Riley*, 900 S.W.2d at 719.

O'Connor further cites SACU's motive for conspiring with Jennings to damage him as evidence of a conspiracy. According to O'Connor, it was clear that Jennings had threatened SACU for failing to retain 10% of the first three draws as required by the CLA. Based upon this threat, O'Connor contends SACU agreed to terminate Laco in order to pacify Jennings. A note in the file clearly referring to the failure to withhold retainage from the first three draws states that Jennings "is willing to drop the issue if we agree to be his permanent lender." Another notation on the same paper states, "We will not consider doing the permanent loan just because he said he would drop the retainage issue."

Jacobs testified that SACU did not feel threatened by Jennings' comments and did not make the loan to him based upon his statements. According to Jacobs, "[t]here was [sic] plenty of funds left in the loan amount to cover the retainage and correct that error." Jacobs further testified that SACU made a second loan to Jennings because, with liens on the property, no other financial institution would fund a loan to him. We cannot reasonably infer from these facts that SACU conspired to harm O'Connor.

Finally, we note that O'Connor's conspiracy argument centers around SACU's and Jennings' concerted actions as proof of the alleged conspiracy. However, the Texas Supreme Court has held that proof of acting in concert does not show the specific intent necessary to prove a civil conspiracy claim. *See Riley*, 900 S.W.2d at 719 (rejecting argument that tortfeasor need only intend to engage in conduct that results in injury to prove conspiracy and holding tortfeasor must be aware of harm at inception of agreement). Thus, SACU's actions do not, by themselves, give rise to an inference that by so acting it intended to defame O'Connor or cause him emotional distress. Furthermore, the specific intent element of a conspiracy cause of action requires the conspirators to have the intent to cause harm *at the inception of the agreement*. *Barajas*, 927 S.W.2d at 617; *Riley*, 900 S.W.2d at 719. O'Connor points out several incidents that, according to him, show SACU and Jennings engaged in a conspiracy to harm him. However, he never pinpoints the moment that SACU and Jennings actually reached an agreement to harm him. And there is no evidence, either direct or circumstantial, to show that at any particular moment they intended to defame O'Connor or inflict emotional distress on him.

There is no direct evidence that SACU specifically intended to defame or to inflict emotional distress upon O'Connor. And although the circumstantial evidence may show that SACU and Jennings agreed to terminate their contracts with O'Connor and Laco, and that SACU provided Jennings with documentation that Jennings used to develop the criminal complaint, there simply is no evidence from which a jury could infer that SACU intended by its actions to cause O'Connor emotional distress or make slanderous statements about him. Accordingly, we hold the evidence is legally insufficient to support the jury's verdict on conspiracy. SACU's issue is sustained.

The jury's civil conspiracy finding against SACU rendered it jointly and severally liable with the Jennings for damages arising from Jennings' allegedly tortious conduct. After finding that SACU conspired with Jennings to defame and intentionally inflict emotional distress upon O'Connor, the jury found that the harm to O'Connor resulted from SACU's malice. The jury awarded O'Connor $3,000,000.00 in exemplary damages against SACU for its conduct. Because the evidence does not support the jury's findings, we reverse the trial court's judgment rendering SACU jointly and severally liable with the Jennings for O'Connor's damages arising from his malicious prosecution and intentional infliction of emotional distress claims. Furthermore, we reverse the trial court's judgment awarding O'Connor $3,000,000.00 in exemplary damages against SACU and we render judgment that O'Connor take nothing from SACU in relation to his conspiracy claims.

## C. *The Jennings*

### 1. **Malicious Prosecution**

 The Jennings challenge the legal and factual sufficiency of the evidence supporting the jury's malicious prosecution finding. To prevail in a malicious prosecution case, the plaintiff must establish that: (1) a criminal prosecution was commenced against the plaintiff; (2) the prosecution was initiated or procured by the defendant; (3) the prosecution terminated in favor of the plaintiff; (4) the plaintiff was innocent; (5) the defendant lacked probable cause to instigate the prosecution; (6) the defendant acted with malice in bringing the prosecution; and (7) the plaintiff suffered damages as a result of the prosecution. *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 517 (Tex.1997); *Zess v. Funke*, 956 S.W.2d 92, 93 (Tex.App.-San Antonio 1997, no pet). The Jennings only challenge elements four and five—whether they lacked probable cause to instigate the prosecution and whether O'Connor was innocent.

### a. *Probable Cause*

 In the context of a malicious prosecution cause of action, probable cause is defined as the existence of facts and circumstances that would excite a belief in a reasonable person, acting on the facts within his knowledge, that the person charged is guilty of a crime. *Richey*, 952 S.W.2d at 517; *Akin v. Dahl*, 661 S.W.2d 917, 921 (Tex.1983). The question is not what the actual facts are, but what the defendant honestly and reasonably believed the facts to be. *Richey*, 952 S.W.2d at 517; *Akin*, 661 S.W.2d at 920–21. An initial presumption exists in malicious prosecution cases that the defendant acted reasonably, in good faith, and had probable cause to initiate the proceedings. *Richey*, 952 S.W.2d at 517; *King v. Graham*, 47 S.W.3d 595, 606 (Tex.App.-San Antonio 2001, no pet.) (en banc). This presumption is rebutted, however, when the plaintiff introduces evidence that the motives, grounds, beliefs, or other evidence on which the defendant based its actions are

unreasonable. *Richey,* 952 S.W.2d at 518; *King,* 47 S.W.3d at 606. The burden then shifts to the defendant to offer proof of probable cause. *Richey,* 952 S.W.2d at 518; *King,* 47 S.W.3d at 606.

When the facts underlying the defendant's decision to prosecute are disputed, the trier of fact is charged with resolving conflicts in the evidence to determine if probable cause exists. *Richey,* 952 S.W.2d at 518; *Akin,* 661 S.W.2d at 920. If the facts are uncontested, then the question of whether the defendant acted based upon probable cause becomes a question of law to be decided by the court. *Richey,* 952 S.W.2d at 518; *Akin,* 661 S.W.2d at 920. Because the facts underlying Jennings' decision to prosecute are disputed, the jury was charged with weighing the evidence and resolving any conflicts. *King,* 47 S.W.3d at 607.

Jennings charged in his complaint that O'Connor misappropriated loan proceeds. Although we begin with the presumption that Jennings made this complaint based upon probable cause, O'Connor offered evidence that Jennings' beliefs, which served as the basis for filing the criminal complaint, were unreasonable. O'Connor testified that he was unable to pay the subcontractors, not because he misappropriated funds, but because of low profit margins, agreed upon "extras" added to the house for which Jennings allegedly refused to pay, a lumber theft, which Jennings was aware of, the bank's withholding of "retainage" despite the fact that O'Connor and Jennings had agreed to waive its retention, and the eventual freeze placed on construction advances. Based on this evidence, viewed in a light most favorable to the jury's verdict, we hold the jury could have found Jennings' belief that O'Connor had misappropriated loan funds was unreasonable. And although conflicting evidence was presented upon which the jury could have arrived at a different result, the jury's finding of lack of probable cause is not so against the great weight and preponderance of the evidence as to be manifestly unjust. Possibly, the jury believed that Jennings knew the money was tied up in "retainage," that the lumber bill was unpaid, not because O'Connor stole the money, but because of a theft from the construction site, and that the costs associated with the "extras" were consuming money that should have been used to pay for the originally agreed upon bid. The fact that O'Connor was ultimately indicted is immaterial to the issue of probable cause. *See Turner v. Roadway Express, Inc.,* 911 S.W.2d 224, 227 (Tex.App.-Fort Worth 1995, writ denied) (stating events subsequent to action of confinement or legal proceedings immaterial to defendant's beliefs at time proceedings instituted).

### b. *O'Connor's Innocence?*

The Jennings further contend that the evidence is legally and factually insufficient to support a finding that O'Connor was innocent. They point out that after a two-year investigation by the district attorney and the Fair Oaks Police Department, the case against O'Connor simply was dismissed with the intent that it be re-indicted.[2] The evidence supports the Jennings' argument. However, O'Connor testified that he did not misappropriate funds, as charged in the indictment. The trier of fact believed O'Connor's testimony and, therefore, believed that he was innocent of the charges. *See King,* 47 S.W.3d at 608.

---

**2.** The dismissal of an indictment is relevant to whether the prosecution terminated in the plaintiff's favor. *See Richey,* 952 S.W.2d at 517; RESTATEMENT (SECOND) OF TORTS § 658 (1977). The Jennings do not challenge the evidence supporting this element of the jury's malicious prosecution finding.

Thus, legally and factually sufficient evidence exists to support the jury's finding of innocence.

## 2. Defamation

The Jennings challenge the jury's defamation finding on several grounds. First, they argue that O'Connor's cause of action is barred by the applicable statute of limitations. Secondly, they rely on the defenses of "substantial truth" and "absolute privilege" for their assertion that O'Connor cannot recover, as a matter of law, damages arising from Dennis Jennings' allegedly defamatory comments.[3]

### a. Statute of Limitations

■■■■■ A one-year statute of limitations applies to an action for defamation. TEX. CIV. PRAC. & REM.CODE ANN. § 16.002(a) (Vernon 2002). An action for defamation accrues when the defamatory statement is published. See Kelley v. Rinkle, 532 S.W.2d 947, 949 (Tex.1976) (holding "that the period of limitations for causes of action for libel of one's credit reputation by publication of a defamatory report to a credit agency begins to run when the person defamed learns of, or should by reasonable diligence have learned of, the existence of the credit report"). The discovery rule has limited application to defamation claims. See id. It applies only where the injury is inherently undiscoverable within the limitations period and is objectively verifiable. S.V. v. R.V., 933 S.W.2d 1, 7–8 (Tex.1996); Computer Assocs. Int'l, Inc. v. Altai, Inc., 918 S.W.2d 453, 456 (Tex.1996). Whether the discovery rule applies to a given context is a question of law. Steel v. Rhone Poulenc, Inc., 962 S.W.2d 613, 618 (Tex.App.-Houston [1st Dist.] 1998), aff'd, 997 S.W.2d 217 (Tex.1999); see Moreno v.

Sterling Drug, Inc., 787 S.W.2d 348, 351 (Tex.1990) (stating "the question when a cause of action accrues is a judicial one"). If the discovery rule applies, then the statute of limitations on O'Connor's defamation claim would not begin to run until O'Connor knew, or through exercise of reasonable diligence, should have known of the facts giving rise to his cause of action. Wagner & Brown, Ltd. v. Horwood, 58 S.W.3d 732, 734 (Tex.2001).

In its charge to the jury, the trial court applied the discovery rule and asked "By what date should Timothy D. O'Connor, in the exercise of reasonable diligence, have discovered statements in the criminal complaint?" The jury answered "Date Served/Arrested." The Jennings argue that the trial court erred in submitting the issue to the jury because the criminal complaint was not "inherently undiscoverable" as "O'Connor was specifically put on notice by Jennings' January 14, 1993 letter that he intended to pursue the violation of the Property Code with the DA's office....". The letter contained the following statement:

> For your information, your misapplication of the funds received from the lender (SACU) is a very serious criminal offense. According to § 162.011 of the Texas Property Code you have committed a felony of the third degree. Our client intends to pursue this matter with the Bexar County District Attorney.

The Jennings maintain that the allegedly defamatory statements were not inherently undiscoverable because the letter acted as sufficient notice to O'Connor that a criminal complaint had or would be filed. They cite Computer Assocs. Int'l, Inc. v. Altai, Inc., 918 S.W.2d 453 (Tex.1996),

---

**3.** The Jennings also list a challenge to the legal and factual sufficiency of the evidence in their statement of issues. However, the issue is not adequately briefed. Thus, any sufficiency challenge is waived. TEX.R.APP. P. 38.1(h).

*Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539 (5th Cir.), *cert. denied*, 534 U.S. 945, 122 S.Ct. 329, 151 L.Ed.2d 243 (2001), and *Ellert v. Lutz*, 930 S.W.2d 152 (Tex.App.-Dallas 1996, no writ) to support their claim. The Texas Supreme Court in *Altai* held that misappropriation of a trade secret was not inherently undiscoverable, particularly in an age of high employee mobility and easy transportability of information. *Altai*, 918 S.W.2d at 457. According to the court, "[s]uspicions should abound when a competitor markets a product similar to that previously developed by a former employee after one of the former employer's employees begins work for the competitor." *Id.* In *Procter & Gamble*, the Fifth Circuit affirmed a summary judgment granted in Amway's favor on statute of limitations grounds. 242 F.3d at 566. In that case, rumors had circulated for years that P & G was associated with Satanism. In the mid–1990's an Amway distributor made statements again linking P & G to Satanism. P & G sued Amway for defamation in 1995, but the undisputed evidence showed that "P & G knew, or reasonably should have known, by the mid-to-late 1980's that it could not rely on Amway's statements that Amway would help stop the Satanism rumor," and therefore, the rumor was not inherently undiscoverable. *Id.* And finally, in *Ellert*, Ellert sued Lutz for defamation based on a memorandum from Lutz to a co-employee regarding Ellert's termination. *Ellert*, 930 S.W.2d at 154, 155. The memo was dated April 5, 1991, and the evidence showed that it was placed in Ellert's employee file on the same day. Ellert appealed the summary judgment granted in Lutz's favor, claiming that the discovery rule applied to her defamation claim. *Id.* The appeals court disagreed, holding that the memorandum was not inherently undiscoverable. *Id.* at 156. The evidence showed that Ellert had easy access to her personnel file and the memorandum at all times. *Id.*

The cases the Jennings rely on are inapposite to the case before us. In each of those cases, the tortious acts had already been committed and triggered the running of the statute. Here, the Jennings maintain that the letter warning O'Connor of the possibility that Jennings may pursue a criminal action acts as the statute's triggering mechanism. The Jennings' argument that the letter to O'Connor made him aware of the complaint is flawed for two reasons. First, this letter did not provide O'Connor notice that Jennings *actually had filed a complaint* with the district attorney. Rather, the letter merely speaks of his intent to do so. In addition, the letter provides no indication of *when* Jennings planned to consult with the district attorney about O'Connor's alleged criminal actions. In fact, Jennings did not file his complaint with the district attorney until August of 1993, approximately seven months after O'Connor received the letter. If we viewed the letter as proper notice to O'Connor, then we would be placing a duty on O'Connor to periodically review his criminal record, possibly for an indefinite period, until a complaint, if any, was filed.

Furthermore, O'Connor points out that the filing of a criminal complaint is confidential, citing article 20.02 of the Texas Code of Criminal Procedure. Tex.Code Crim. Proc. Ann. art. 20.02 (Vernon Supp. 2003). To the extent that the complaint is presented to the grand jury, O'Connor's assertion is true. *Id.* The Open Records Act further limits the ease with which an individual may review his criminal record. The Act makes public "a completed report, audit, evaluation, or investigation made of, for, or by a governmental body, . . . ." Tex. Gov't Code Ann. § 552.021–022(a)(1) (Vernon Supp.2003). However, criminal record information is excepted from required pub-

lic disclosure: "[i]nformation held by a law enforcement agency or prosecutor that deals with the detection, investigation, or prosecution of crime" is excepted from the requirements of section 552.021 if "release of the information would interfere with the detection, investigation, or prosecution of the crime...." *Id.* § 552.108; Op. Tex. Att'y Gen. No. MW–95 (1979). The exception deals primarily with the public's right to information. Op. Tex. Att'y Gen. No. MW–95 (1979). When asked whether a county sheriff's office is required to furnish *an individual* a copy of his own criminal history record, the Texas Attorney General opined that it should. *Id.*

We can extract from the statute, as well as the attorney general's opinion, that although an individual should be given a copy of his criminal record upon request, if the release of the information would interfere with the investigation or prosecution of the individual, a governmental body can refuse to distribute that information to the requesting party. In some situations, a criminal complaint may be "inherently undiscoverable" depending on its importance to a criminal investigation. In other instances, an individual may easily obtain his or her criminal record.

■ We hold that the discovery rule applies here and that the trial court did not err in submitting the issue to the jury. A person should not be required to check his or her criminal record periodically for potentially an indefinite period, in the event that a complaint which might contain defamatory comments is filed against that person. In this situation, however, O'Connor had some notice that Jennings intended to seek redress for the perceived

wrongs. We must therefore determine in light of this "notice," whether O'Connor acted with due diligence to discover the allegedly defamatory statements, thus deferring the accrual of his cause of action. *Altai,* 918 S.W.2d at 456. Under the Jennings' theory, O'Connor had notice of the criminal complaint and was under a duty to act with reasonable diligence to discover the complaint within a year of its filing. Because, according to the Jennings, O'Connor has made no showing that he acted diligently to discover the complaint, limitations began to run on the day the complaint was filed in 1993 and O'Connor's lawsuit, filed in 1995, is time-barred.

First, we reemphasize that the nature of the complaint makes it difficult if not impossible to discover. Second, the letter Jennings sent to O'Connor does not amount to sufficient notice, triggering a duty on O'Connor's behalf to check his criminal record periodically. The Jennings rely on *Wheeler v. Methodist Hosp.,* 95 S.W.3d 628 (Tex.App.-Houston [1st Dist.] 2002, no pet. h.), to show that the letter was sufficient notice.[4] In *Wheeler,* the hospital filed a report noting Wheeler's suspension with the National Practitioner Data Bank. *Id.* at 633. Reports filed with the data bank are not public record, but are available to hospitals, boards of medical examiners or other state licensing boards, and physicians requesting information about themselves. *Id.* at 636. The hospital argued that Wheeler knew of the report on March 24, 1995, the date the hospital sent him a letter, informing him that the hospital would report his suspension to the data bank. *Id.* at 637. Wheeler admitted that he was "too frightened"

---

4. In their brief, the Jennings actually cite to *Wheeler v. Methodist Hosp.,* No. 01–98–00922–CV, 2000 WL 1877658 (Tex.App.-Houston [1st Dist.] Dec. 28, 2000). Since our first opinion in this case, however, the First Court of Appeals withdrew its opinion of December 28, 2000 and substituted a new opinion in its place. This new opinion does not change our analysis.

to follow up and that he did not know how to get information from the data bank. *Id.* at 638. The court first noted that state and federal law precluded the report from being a matter of public knowledge. *Id.* at 636. But, according to the court, Wheeler's excuses for not reviewing the information did not satisfy the requirement that he exercise reasonable diligence in trying to discover his cause of action and, therefore, the statute of limitations began to run on March 24, 1995, the day the hospital sent him the letter. *Id.* at 639.

O'Connor, like the doctor in *Wheeler*, had notice that Jennings *intended* to file a complaint with the district attorney. However, in *Wheeler* the doctor knew the report had been filed and did nothing to determine what it contained. Here, there is no evidence that Jennings or the district attorney contacted O'Connor and told him a complaint had been filed or that O'Connor actually knew about the criminal complaint until he was arrested. Accordingly, we hold there is nothing to show O'Connor failed to act diligently in discovering the allegedly defamatory statements.

### b. *Privilege*

 The Jennings, in the alternative, argue that the criminal complaint was related to a judicial proceeding and is protected by an absolute privilege. An absolute privilege applies to communications published during the course of a proposed or existing judicial proceeding. *James v. Brown*, 637 S.W.2d 914, 916 (Tex.1982). Whether an alleged defamatory communication is related to a proposed or existing judicial proceeding is a question of law. *Thomas v. Bracey*, 940 S.W.2d 340, 343 (Tex.App.-San Antonio 1997, no writ). When Jennings filed the criminal complaint, no judicial proceedings had been proposed. Furthermore, an investigation into criminal activity does not amount to a "proposed judicial proceeding." A judicial

proceeding would only be "proposed" when the investigating body found enough information either to present that information to a grand jury or to file a misdemeanor complaint. Accordingly, the complaint is not absolutely privileged.

 O'Connor claims that a qualified privilege applies to the complaint, but was destroyed because Jennings acted with malice. A qualified privilege "arise[s] out of the occasion upon which the false statement is published." *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 768 (Tex.1987). Yet, to be entitled to a qualified privilege, the defendant's statement must (1) be made without malice; (2) concern a subject matter that is of sufficient interest to the author, or be in reference to a duty the author owes; and (3) be communicated to another party having a corresponding interest or duty. *Grant v. Stop-N-Go Mkt. of Tex., Inc.*, 994 S.W.2d 867, 874 (Tex.App.-Houston [1st Dist.] 1999, no pet.); *Butler v. Central Bank & Trust Co.*, 458 S.W.2d 510, 514 (Tex.Civ.App.-Dallas 1970, writ dism'd); *see Cain v. Hearst Corp.*, 878 S.W.2d 577, 582 (Tex.1994). We hold that a qualified privilege applies here. *See Randall's Food Mkts. Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex.1995) (communications made in course of an investigation after report of employee wrongdoing); *Hurlbut*, 749 S.W.2d at 768 (communications to assistant attorney general reporting suspected insurance fraud); *Marathon Oil Co. v. Salazar*, 682 S.W.2d 624, 631 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.)(filing of criminal complaint about suspected employee theft). Assuming O'Connor committed criminal acts and that Jennings knew about the acts, Jennings had a duty to make the complaint. The complaint was made to the district attorney, who had a corresponding duty to investigate Jennings' claims. However, the jury found that Jennings acted with

malice. And, as we have already held, there is sufficient evidence to support the jury's finding that Jennings knew the statements contained in the complaint were false or had doubts about their truth. Any privilege that applied to the statements was, therefore, destroyed by Jennings' malicious conduct.

### c. *Substantial Truth*

The Jennings also maintain that O'Connor's defamation claim is barred as a matter of law because the allegations contained in the complaint were substantially true. Truth is a complete defense to defamation. *See* Tex. Civ. Prac. & Rem. Code Ann. § 73.005 (Vernon 1997); *Johnson*, 891 S.W.2d at 646; *Milam v. Nat'l Ins. Crime Bureau*, 989 S.W.2d 126, 130 (Tex.App.-San Antonio 1999, no pet.). Because truth is an affirmative defense, the defendant bears the burden of establishing that the alleged defamatory statements were true. *Tatum v. Liner*, 749 S.W.2d 251, 256 (Tex.App.-San Antonio 1988, no writ). The statements need not be literally true; "substantial truth" is sufficient. *See McIlvain v. Jacobs*, 794 S.W.2d 14, 15 (Tex.1990); *Milam*, 989 S.W.2d at 130; *Stephens v. Delhi Gas Pipeline Corp.*, 924 S.W.2d 765, 769 (Tex.App.-Texarkana 1996, writ denied). Under the substantial truth test, a statement is not considered false unless it would have a different effect on the mind of the average listener than a true statement would. *McIlvain*, 794 S.W.2d at 16.

Some of the charges contained in Jennings' complaint are as follows:

- Annie O'Connor, O'Connor's wife, owned a children's clothing store. The store "has either changed names under new ownership ... or they have declared bankruptcy and opened again under a new name to avoid previous creditors."
- The wife of one of the subcontractors told Jennings that O'Connor made several trips to Las Vegas and was involved in "high stakes" or "big time" gambling.
- O'Connor refused to return Jennings' phone calls.
- O'Connor's insurance company told Jennings that O'Connor's claim arising out of the stolen lumber was fraudulent.
- O'Connor misappropriated or embezzled funds drawn to complete the construction of the Jennings' home.

The Jennings urge that although the truthfulness of some details contained in the complaint is in dispute, "the accusations as a whole were substantially true...." There is conflicting evidence, however, relating to each of the allegations listed above. For example, O'Connor testified he never took a lengthy trip, but he admitted to being out of town researching a restaurant concept. The evidence demonstrates that Annie O'Connor lost the lease on the building where her children's clothing store was located and was forced to close her business. Another children's store opened in the same place where her store had been. The O'Connors did not declare bankruptcy and open under a new name to avoid creditors. Rather, once the store had closed and the O'Connors were unable to sell the clothing, they declared bankruptcy. Furthermore, O'Connor admitted to being in Las Vegas in December. He testified that he made the reservation at the hotel. A receipt showed that he arrived on December 4, 1992, and departed on December 14, 1992. O'Connor explained that his brother actually arrived in Las Vegas on December 4th, that O'Connor met him on the "fifth day that he was there," and that he never participated in high stakes gambling. O'Connor testified that he sent three letters to Jennings, but

admitted that he would not return Jennings' calls in December. O'Connor further testified that his insurance company never indicated to him that it thought his theft claim was fraudulent. In her deposition, the woman alleged to have told Jennings that O'Connor's claim was fraudulent denied ever making that statement. And, the insurance company never threatened to drop O'Connor or Laco as an insured and, in fact, renewed the policy. O'Connor admitted his use of the funds drawn off the Jennings' account did not correspond exactly to his requests. However, he denied embezzling the money. Instead, he claims a low profit margin, SACU's refusal to honor his and Jennings' agreement to waive the retainage, and all the "extras" on the house made it impossible for him to pay the subcontractors.

Viewing the evidence in a light favorable to the jury's verdict, we hold there is more than a scintilla of evidence demonstrating that many of the statements contained in the complaint were false. Similarly, viewing the evidence in a neutral light, the jury's verdict is not so against the great weight and preponderance of the evidence to be manifestly unjust.

### 3. Intentional Infliction of Emotional Distress:

 O'Connor brought an intentional infliction of emotional distress claim against Jennings, alleging Jennings knew or should have known that filing a false criminal complaint against him would lead to an "unwarranted investigation and potential prosecution" and would injure O'Connor's business and reputation in the community. To recover damages for intentional infliction of emotional distress, a plaintiff must prove: 1) the defendant acted intentionally or recklessly, 2) the conduct was extreme and outrageous, 3) the actions of the defendant caused the plaintiff mental distress, and 4) the mental dis-

tress suffered was severe. *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 611 (Tex.1999). The Jennings challenge the legal and factually sufficiency of the evidence supporting the elements of outrageous conduct and severe mental distress.

 Outrageous conduct is behavior that goes beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community. *Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex.1993). The court first determines whether the defendant's conduct may reasonably be regarded as extreme and outrageous. *Casas*, 856 S.W.2d at 734; RESTATEMENT (SECOND) OF TORTS § 46 cmt. h (1977). But, when reasonable minds could disagree, the jury determines whether the conduct is sufficiently extreme and outrageous to result in liability. *See* RESTATEMENT (SECOND) OF TORTS § 46 cmt. h (1977).

The Jennings contend their behavior was not sufficiently outrageous to rise to the level necessary to constitute extreme and outrageous behavior. They rely on *Lang v. City of Nacogdoches*, 942 S.W.2d 752 (Tex.App.-Tyler 1997, pet. denied) as support for their argument. In *Lang*, one brother, William, was entrusted with the care of his mother. *Id.* at 756. The mother told William that her other son, Ben, was harassing her and that she did not want to be bothered by him. *Id.* After the mother gave William her power of attorney, William advised Ben to stay off their mother's property. *Id.* Ben disregarded William's demand and went to visit his mother. *Id.* William filed charges against Ben for criminal trespass and, based upon William's action, Ben sued William for intentional infliction of emotional distress. On appeal, the court held that William's conduct was not outrageous.

It might be considered extreme for someone to have his own brother arrest-

ed while visiting their mother, and Ben ... may have been subjected to distress, embarrassment, trouble and expense because of the arrest. However, because citizens have a duty to report criminal activity to the police, we cannot say that filing the criminal complaint under the circumstances in this case constitutes outrageous behavior. To characterize the conduct of William as extreme and outrageous would tend to stultify the reporting of possible crimes which is not favored as a matter of policy. As a matter of policy, the reporting of criminal conduct should be encouraged. There is no liability for intentional infliction of emotional distress where an actor does no more than insist on his legal rights.

*Id.* at 759–60 (citations omitted).

We recognize that the facts in *Lang* are not completely aligned with the facts here. In *Lang*, it was undisputed that Ben trespassed on his mother's property, despite William's warning. In this case, whether Jennings believed that the statements he made in the complaint to the district attorney were true is controverted. Nevertheless, the policy considerations announced in *Lang* are equally applicable to the facts of the case herein. As in *Lang*, we cannot say that the Jennings' filing of a criminal complaint against O'Connor constitutes outrageous behavior. Accordingly, we hold that the Jennings' conduct was not sufficiently outrageous to permit recovery for intentional infliction of emotional distress.

We also recognize that our holding here may appear to be incongruent with our holding that sufficient evidence was introduced to support the jury's malicious prosecution finding. But, in the malicious prosecution context, whether a person act-

ed based upon probable cause is a question of reasonableness. *Richey v. Brookshire Grocery Co.,* 952 S.W.2d 515, 517 (Tex.1997); *Akin v. Dahl,* 661 S.W.2d 917, 921 (Tex.1983). That is, whether the complainant honestly and reasonably believed that another's actions were criminal. *Richey,* 952 S.W.2d at 517; *Akin,* 661 S.W.2d at 921. In the case of intentional infliction of emotional distress, the issue is whether the conduct is outrageous—that is, whether the behavior goes beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community. *Casas,* 856 S.W.2d at 734. We, therefore, hold that there is no evidence that Jennings' conduct—reporting a possible criminal offense—was extreme and outrageous. We, therefore, reverse the trial court's judgment and render judgment that O'Connor take nothing on his intentional infliction of emotional distress claim.

The actual damages question was submitted in broad form incorporating three theories of tort liability—malicious prosecution, defamation, and intentional infliction of emotional distress—and the jury awarded O'Connor damages for all three causes of action. Because the damages question was submitted broad form, we cannot determine whether the jury based its damages finding on the intentional infliction of emotional distress claim, a claim for which there was legally insufficient evidence, or whether the jury based its damages finding on the other two causes of action. *Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378, 388 (Tex.2000). Accordingly, we reverse the trial court's actual damages award against the Jennings and remand O'Connor's tort causes of action—malicious prosecution and defamation—to the trial court for a new trial. TEX.R.APP. P. 44.1(b); *Casteel,* 22 S.W.3d at 388.[5] Fur-

---

5. In light of our disposition here, we need not reach the Jennings' independent complaints

thermore, because the jury's malice finding and exemplary damages award was based on its affirmative defamation finding, we remand the issue of whether Jennings acted maliciously in making the allegedly defamatory statements to the jury for further proceedings consistent with this opinion. Tex.R.App. P. 44.1(b).

### D. *Breach of Contract:*

#### 1. SACU

 SACU and the Jennings challenge the legal and factual sufficiency of the evidence supporting the jury's finding that each breached its contract with Laco. The jury found in Laco's favor on the breach of contract action against SACU. SACU claims that "the evidence conclusively established that SACU did not breach its contract with Laco because, under the contract and Texas law, SACU expressly had the right to halt draws at the instruction of the homeowner, to hold a retainage, and to disburse directly to the subcontractors." Furthermore, according to SACU, O'Connor was not damaged by its decision to withhold draws from him before receiving Jennings' instruction to do so, because the evidence shows that O'Connor did not request a draw until after Jennings' instruction to stop all draws. SACU cites to section 53.081 of the Texas Property Code for its assertion. Section 53.081 provides, in part:

> If an owner receives notice under Section 53.056, 53.057, 53.058, 53.252, or 53.253, the owner may withhold from payments to the original contractor an amount necessary to pay the claim for which he receives notice.

Tex. Prop.Code Ann. § 53.081 (Vernon Supp.2003).

Although SACU correctly points out that it may halt draws at the homeowner's

instruction, there is evidence in the record that SACU withheld draws from Laco before receiving proper authorization from the Jennings to do so. Tex. Prop.Code Ann. § 53.081 (Vernon Supp.2003), § 53.101 (Vernon 1995). Specifically, the evidence shows SACU froze the account based on a phone call from Guido Lumber informing SACU that its account was past due. Furthermore, the evidence shows SACU froze all funds from the loan, rather than just the amount necessary to cover the past due amount. However, because O'Connor did not request loan funds until after Jennings instructed SACU to hold all draws, he has not proven that he was damaged by SACU's action. *See Aquila Southwest Pipeline, Inc. v. Harmony Exploration, Inc.,* 48 S.W.3d 225, 235 (Tex. App.-San Antonio 2001, pet. denied)(stating plaintiff must prove he was damaged as result of breach of contract).

The CLA provides that SACU "may, in its discretion, make payments for the cost of construction of the Improvements by check payable jointly to Borrower and Contractor or payable directly to any contractor, subcontractor, or supplier." There is no other provision that allows SACU to make payments to the borrower only. The evidence presented, however, shows that SACU issued checks payable only to Jennings, rather than to Laco and Jennings jointly, as required by the contract. SACU points out that the contract had already been terminated when it issued those checks to Jennings. The testimony at trial, however, demonstrates that Jennings and a SACU representative met on December 29, 1992. Jennings agreed at trial that all checks issued "from December on" were made payable to either himself or to a subcontractor. Jennings

regarding submission of the actual damages questions.

did not terminate the contract until January 14, 1993.

We hold the evidence, viewed under either the legal or factual sufficiency standard, is sufficient to support the jury's finding that SACU breached its agreement with Laco.

## 2. Jennings

 The Jennings also challenge the jury's breach of contract finding, alleging it is unsupported by legally or factually sufficient evidence. In its petition, Laco alleged the Jennings wrongfully terminated Laco from its duties under the contract and wrongfully refused to pay Laco for work performed pursuant to the contract. The jury found the Jennings failed to comply with the written agreement they had with Laco and awarded Laco $33,000.00 for the breach. It also found Laco performed compensable work for the Jennings, which was not included in the contract, and found the value of that work to be $12,000. The trial judge entered judgment on the jury's findings and awarded Laco $45,000.00 plus pre-judgment interest in "damages resulting from its breach of contract and quantum meruit claims against" the Jennings.[6]

The Jennings only challenge the sufficiency of the evidence supporting the breach of contract finding. Again, there is evidence of a low profit margin on the construction contract, a lumber theft from the construction site, that Jennings requested and was provided "extras" and agreed to pay for the extras out of his own pocket, rather than adding them to the bid price, and that Jennings ordered SACU to withhold all construction advances from O'Connor. However, there is also evidence that Jennings received notice of an outstanding debt owed to a subcontractor and that upon receiving that notice, Jennings inquired into the payment status of other subcontractors. His investigation revealed that other subcontractors also were owed money by O'Connor.

Viewed in a light favorable to the verdict or in neutral light, the jury could reasonably have concluded that Jennings knew O'Connor had not misappropriated funds, but was short of funds to pay subcontractors for other reasons and that Jennings wrongfully terminated Laco, breaching the contract.

## 3. Prior Material Breach

 Alternatively, SACU and the Jennings argue that the evidence conclusively

---

**6.** The $45,000 award in the judgment represents the jury's damages findings of $33,000 for breach of contract and $12,000 for the value of compensable work performed. The award gives Laco an improper double recovery. If a plaintiff partially performs an express contract but was prevented from completing its performance because of the defendant's breach, the plaintiff can elect to recover damages for breach of contract or rescind the contract and recover restitution damages in quantum meruit. *See Burlington N. R.R. Co. v. Southwestern Elec. Power Co.*, 925 S.W.2d 92, 97 (Tex.App.–Texarkana 1996), *aff'd on other grounds*, 966 S.W.2d 467 (Tex.1998); *Coon v. Schoeneman*, 476 S.W.2d 439, 442 (Tex.Civ.App.-Dallas 1972, writ ref'd n.r.e.). On appeal, the Jennings

do not complain about the double recovery of damages for both breach of contract and quantum meruit. Therefore, any complaint they may have about improper double recovery is waived. *See Elias v. Mr. Yamaha, Inc.*, 33 S.W.3d 54, 60 n. 8 (Tex.App.-El Paso 2000, no pet.); *Johns v. Ram–Forwarding, Inc.*, 29 S.W.3d 635, 638 (Tex.App.-Houston [1st Dist.] 2000, no pet.).

In their reply brief, the Jennings do argue that quantum meruit cannot, as a matter of law, serve as a basis for a breach of contract claim. Here, O'Connor sought to recover on both quantum meruit and breach of contract grounds. Wrongful termination, not unjust enrichment, was his ground for recovery in the breach of contract action.

establishes that any breach was excused by Laco's prior material breach. They claim that before disbursements to Laco were halted, they discovered that Laco had received draws for specific subcontractor work, but that Laco had not used the draws to pay for the work indicated in the draw request. SACU maintains that "[t]hat failure was a direct breach of paragraph 1 of the Contract for Improvements *and* the agreement on each draw request." (emphasis added). A breach of a contract by one party excuses performance by the other party. *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 689 (Tex.1981).

SACU's and the Jennings' argument is flawed for two reasons. First, Laco sued SACU and the Jennings under the CLA. Although the CLA incorporates by reference the Contract for Improvements executed by O'Connor and the Jennings, it does not incorporate the agreement on the draw requests submitted to SACU by O'Connor.[7] The trial court asked the jury whether the defendants' breaches of the CLA were excused "by Laco's previous failure, if any, to comply with a material obligation of the *same agreement,*" that being the CLA (emphasis added). Accordingly, a question regarding "the agreement on each draw request" was not submitted to the jury. This court, therefore, cannot consider whether any breach of that agreement excuses SACU's or the Jennings' breach.

Paragraph 1 of the Contract for Improvements, which formed the basis of the trial court's prior material breach question, provides:

**Construction of Improvement.** Contractor agrees to furnish and pay for all labor and materials needed to construct the following improvements within days from the date of this Contract in a good and workmanlike manner according to the drawings and specifications agreed upon by Owner and Contractor and approved by Lender:

**A single-family residence and related improvements as facilities to be constructed on the Real Property described below.**

Both SACU and the Jennings rely on Laco's failure to pay certain subcontractors and the fact that liens subsequently were placed on the Jennings' home as evidence that Laco materially breached the contract. Paragraph one of the Contract for Improvements appears to contain language which limits the time within which improvements should be paid. However, it does not actually place any restriction on *how, when,* or *to whom* loan proceeds should be paid. Without such a restriction, O'Connor could not have breached the contract in the manner SACU and the Jennings suggest. Accordingly, the evidence does not conclusively establish that, as a matter of law, O'Connor materially breached the contract, thus excusing SACU's and the Jennings' breaches.

**4. Attorney's Fees**

■ The jury awarded O'Connor $12,000.00 against SACU and $13,200.00 against the Jennings in attorney's fees stemming from the jury's breach of contract finding. SACU and the Jennings claim there is legally insufficient evidence to support the jury's award of attorney's fees to O'Connor because evidence of a

---

7. The agreement on the draw requests sheets is as follows: "I, the undersigned, by submission of this request, certify that the loan proceeds being drawn will be applied only to those materials and labor listed hereunder which is now or will become of a part of the security property securing said loan. Further, all items being drawn are complete or on site as of the dte [sic] of this draw."

contingency fee arrangement only is insufficient evidence of attorney's fees as articulated in *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818–19 (Tex. 1997). In *Arthur Andersen*, the supreme court concluded that evidence of a contingency fee agreement alone cannot support an award of reasonable and necessary attorney's fees. *Id.* at 818. While a contingency fee contract should be considered by the factfinder, the factfinder should also be guided by the other factors articulated in the Rules of Professional Conduct governing fees. *Id.*; Tex. Disciplinary R. Prof'l Conduct 1.04(b), *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G app. A (Vernon 1998); *see Aquila*, 48 S.W.3d at 240–41 (applying factors to breach of contract claims). The court held that a party must prove that the amount of fees was both reasonably incurred and necessary to the prosecution of the case, and must ask the jury to award the fees in a specific dollar amount, not as a percentage of the judgment. *Arthur Andersen*, 945 S.W.2d at 819.

Gerald Drought, O'Connor's and Laco's trial lawyer, first testified that he, O'Connor, and Laco had a 40% contingency fee agreement and that such a percentage is the standard in Bexar County. He then discussed the guidelines set forth by the Texas Supreme Court in *Arthur Andersen*. First, he identified the "time and labor" factor and testified that the trial itself consumed a significant amount of time. Specifically, Drought testified that "[f]or every hour that a lawyer spends in Court, I think it's safe to say they probably spend eight or nine hours of non-Court time." He then discussed the novelty and difficulty of the question involved, recognizing

that although this is not the most difficult case "ever visited in the Bexar County courthouse," it is not a particularly simple case. He also testified that his involvement in this case has prevented him from being involved in others. Drought reemphasized that, in his opinion, a 40% contingency fee arrangement is reasonable in Bexar County. Drought, however, recognized that neither the time limitation nor the nature and length of the relationship with the client factors were relevant to this case.

David West, SACU's trial attorney, testified regarding attorney's fees. First, West agreed with Drought that contingency fee arrangements range from between 33 and 40 percent. However, he stated that 40 percent is "on the high end."

██ SACU argues that Drought's testimony is too general and ignores the degree of specificity *Arthur Andersen* requires, because Drought offered no time sheets and only made a "guesstimate" about in-court versus out-of-court time. We agree. Although evidence of a contingency fee may be considered by the factfinder in determining an appropriate amount of attorney's fees, a party seeking attorney's fees must ask the jury to award fees in a specific dollar amount, rather than merely a percentage of the total award. *Id.* Drought never testified that a specific amount of money was a reasonable attorney's fee award. Accordingly, we hold the evidence is legally insufficient to support the jury's attorney's fee award and we render judgment that O'Connor take nothing on his claim for attorney's fees arising from the breach of contract.[8]

---

8. In its sole cross issue, Laco contends that the evidence established as a matter of law its entitlement to 40% of the total amount recovered and thus, the trial court erred in denying its motion to enter judgment notwithstanding the verdict on the jury's answer to the question of attorney's fees. Although O'Connor's and Laco's attorney's fees expert testified that he believed a 40% contingency fee arrangement reasonable, SACU's expert testified that

### CONSTITUTIONAL MECHANIC'S LIEN

█ Question number 5 asked whether Dennis and Kimberly Jennings failed to comply with the written agreement they had with Laco. The jury answered "yes." Question number 7, conditioned on an affirmative answer to question 5, asked "[w]hat some of money, if any, if paid now in cash, would fairly and reasonably compensate the [sic] Laco for its damages, if any, that resulted from such failure to comply." The jury awarded Laco $33,000.00. In its pleadings, Laco claimed statutory and constitutional liens on the Jennings' property. In its final judgment, the trial court ordered that:

Plaintiff LACO DEVELOPMENT, INC. D/B/A LACO CONSTRUCTION COMPANY shall have foreclosure of a constitutional lien in the amount of $48,858.08, representing the $33,000.00 awarded by the jury in its answer to Question No. 7, plus prejudgment interest in the amount of $15,858.08 on the [Fair Oaks Ranch] property.

It is further ORDERED, ADJUDGED and DECREED that an order of sale shall issue to any sheriff or constable in the State of Texas, to seize and sell the above-described property the same as under execution to satisfy the constitutional lien described above.

The Jennings claim that because the issue of whether Laco was entitled to a lien on their property was never submitted to the jury, Laco's claim is waived. Specifically, the Jennings argue that questions should have presented to the jury, asking for the value of services and/or materials used to complete the house and whether Laco had been paid for providing those services and/or materials. According to the Jennings, jury findings on these issues are essential to a finding of a valid constitutional mechanic's lien.

█ The Texas Constitution provides liens for mechanics, artisans, and material men:

Mechanics, artisans and material men, of every class, shall have a lien upon the buildings and articles made or repaired by them for the value of their labor done thereon, or material furnished therefor; and the Legislature shall provide by law for the speedy and efficient enforcement of such liens.

TEX. CONST. art 16, § 37. This constitutional provision is self-executing. *Hayek v. Western Steel Co.*, 478 S.W.2d 786, 790 (Tex.1972); *Strang v. Pray*, 89 Tex. 525, 35 S.W. 1054 (1896). The self-executing aspect of the constitutional lien translates into automatic protection for the lien-holder. *In re A & M Operating Co.*, 182 B.R. 997, 1000 (E.D.Tex.1995).

Because a constitutional mechanic's lien is "self-executing" and "automatic," it is not necessary for the trial court to submit any issue relating to the lien to the jury. *Weimhold v. Hyde*, 294 S.W. 899, 900 (Tex. Civ.App.-Amarillo 1927, no writ). "Beyond proof of the fact of the existence of the debt, which was found by the jury, and the fact of the labor having been performed, [which is undisputed,] there was no way of submitting the question of constitutional

---

a 40% contingency fee arrangement is not unusual and is "probably on the high end." He further stated that he was unaware of cases in which a fee was based on a contingency fee agreement and a separate jury award. Thus, he opined that the fees requested in this case were unreasonable. Based upon this testimony, Laco and O'Connor have not established their entitlement to additional fees as a matter of law. The jury could have credited West's testimony and concluded that a 40% fee award was unreasonable. Accordingly, we hold the trial court did not err in denying O'Connor's motion for jnov and overrule O'Connor's cross issue.

lien to the jury." *Id.* The Jennings' issue is overruled.

### CONCLUSION

We hold that the evidence is legally insufficient to support the jury's finding that SACU conspired with Jennings to defame O'Connor or intentionally inflict emotional distress upon him. Accordingly, we reverse the trial court's judgment and render judgment that O'Connor take nothing from SACU in relation to its conspiracy claim. We further hold that there was legally insufficient evidence to support the jury's finding that the Jennings intentionally inflicted emotional distress upon O'Connor. Therefore, we reverse the trial court's judgment and render judgment that O'Connor take nothing from the Jennings on his intentional infliction of emotional distress claim. Because the actual damages question asked for damages for all of O'Connor's cause of action, we reverse the trial court's judgment and remand O'Connor's defamation and malicious prosecution claims for further proceedings. We further hold that the jury's breach of contract findings against SACU and Jennings are supported by legally and factually sufficient evidence. Accordingly, the trial court's judgment on breach of contract is affirmed. However, because O'Connor put on legally insufficient evidence to support the jury's attorney's fees award, we reverse the trial court's judgment on attorney's fees and render judgment that O'Connor take nothing on his claim for attorney's fees. Finally, the trial court's judgment awarding O'Connor a constitutional mechanic's lien on the Jennings' property is affirmed.