**Opinion issued June 25, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-11-00201-CV

_____

## ROBERT WRITT, Appellant

## V.

## SHELL OIL COMPANY AND SHELL INTERNATIONAL, E&P, INC., Appellees

---

### On Appeal from the 189th District Court
### Harris County, Texas
### Trial Court Cause No. 2009-65221

---

### DISSENTING OPINION

For more than one hundred years, Texas defamation law has artfully balanced two fundamental interests: a citizen's right to his good name and a citizen's right to free speech. Communications made in the context of judicial

proceedings invoke two additional and equally important interests: a citizen's right to petition for redress and the administration of justice. When the judicial proceedings are criminal in nature, a citizen's interests in the deterrence and prosecution of crime are added to the balance. And when the government investigates a potential crime and calls on a citizen to respond with information, society's interest in encouraging cooperation with the investigation comes into play. In the defamation equilibrium, we safeguard these fundamental interests through privileges.

The Court's new opinion initially focuses on the public policy interests that it concludes require denying Shell an absolute privilege for its statements made in response to a Department of Justice inquiry on possible violations of the Foreign Corrupt Practices Act. According to the Court, recognition of an absolute privilege "would have the very dangerous effect of actually discouraging parties from being truthful with law-enforcement agencies and instead encourage them to deflect blame to others without fear of consequence." I respectfully disagree.

For criminal prosecutions, our jurisprudence has reached a careful accord— we afford a qualified privilege to statements made by a private citizen who approaches a governmental authority with criminal allegations, but we afford an absolute privilege to communications made to prosecuting governmental authorities during or in contemplation of criminal proceedings. When a citizen,

corporate or otherwise, is approached by a law-enforcement agency for cooperation in an ongoing investigation of a contemplated criminal prosecution, the administration of justice requires absolute privilege, which encourages the citizen's full and unreserved cooperation in the agency's information-gathering efforts, unhampered by fear of retaliatory lawsuits. Shell's cooperation with the DOJ falls into this category, and the trial court correctly afforded it absolute privilege. In reaching a contrary holding, the Court gives insufficient weight to both the benefits of an absolute privilege and the costs of a conditional privilege that depends on a speaker's subjective good faith. The Court's holding inevitably will create a fact issue in many cases. And a conditional privilege frustrates the kind of frankness, cooperation, and self-reporting that is vital to the DOJ's prevention and prosecution of corporate misconduct in international business dealings under the FCPA. I believe the balance of the benefits and costs of an absolute privilege for statements made by a potential target of a DOJ investigation, as well as the detriments of requiring jury trials in many of these cases, warrants an absolute privilege. I therefore respectfully dissent.

### *Hurlbut* is not controlling

Before turning to the policy issues, I first will address the only Texas Supreme Court opinion that considers the scope of a privilege for a claimed defamatory statement that is not part of a judicial proceeding: *Hurlbut v. Gulf*

*Atlantic Life Insurance Co.*, 749 S.W.2d 762 (Tex. 1987). I disagree with the Court that Shell is only entitled to a qualified privilege under *Hurlbut*.

In that case, Gulf Atlantic Insurance Company proposed that Hurlbut "form a partnership to serve as the administrator of a proposed health insurance trust which would sell and service group health insurance policies underwritten by Gulf Atlantic" and then later instructed Hurlbut to start selling policies under the trust agreement. *Id.* at 764. A potential client who became concerned when Hurlbut could not produce a copy of the master policy from Gulf Atlantic contacted the Attorney General's office to complain. *Id.* at 764. Gulf Atlantic suggested a meeting with Hurlbut to resolve the matter. *Id.* When Hurlbut arrived for the meeting, he was surprised to be met by an assistant attorney general "assigned to investigate the group health insurance program" sold by Hurlbut. *Id*. During the meeting, Gulf Atlantic's president made a defamatory statement about Hurlbut. *Id.* The Texas Supreme Court refused to apply an absolute privilege. *Id.* at 768. The Court explained that the absolute privilege attaches only to a "select number of situations which involve the administration of the functions of the branches of government." *Id.* And the Court held that "the occasion of Gulf Atlantic's communication to the assistant attorney general in this case is best analogized to the conditional privilege described in section 598 of the Restatement." *Id.*

*Hurlbut* is distinguishable because it is an instigation case—Gulf Atlantic was *not* self-reporting in response to a criminal probe. Hurlbut was a salesperson, not a Gulf Atlantic employee, who sold insurance policies under a trust agreement with Gulf Atlantic. Hurlbut had formed a separate partnership (at Gulf Atlantic's behest) before the incident arose. Thus, Gulf Atlantic reported to evade potential criminal liability by implicating another company (Hurlbut and his partnership), not to confess guilt. Thus, unlike this case, *Hurlbut* involved the instigation of prosecution against someone else, not a confession of culpability. In conclusion *Hurlbut* does not answer whether cooperation with an FCPA investigation by the DOJ implicates one of the "select number of situations which involve the administration of the functions of the branches of government" and therefore requires the recognition of an absolute privilege. *Id*. at 768. It does, however, suggest that our focus should be on public policy considerations, i.e., the administration of government.

## Public policy favors granting an absolute privilege

The rule granting absolute privilege is "one of public policy" so both the Court and I begin our analysis here. *Reagan v. Guardian Life Ins. Co.*, 166 S.W.2d 909, 913 (Tex. 1942).

**A.    The policy reasons that statements made in contemplation of judicial proceedings are absolutely privileged**

Statements made "during the course of judicial proceedings" are absolutely privileged. *Bird v. W.C.W.*, 868 S.W.2d 767, 771 (Tex. 1994). This privilege protects parties not only from liability "but also from the danger of even an unsuccessful civil action." RESTATEMENT (SECOND) OF TORTS ch. 25, topic 2, tit. B, intro. note (1977).

Absolute privileges are recognized to protect public policy interests deemed sufficiently important to trump the rights of individuals who would otherwise have a claim against a person. *See Reagan*, 166 S.W.2d at 913 (absolute privilege is founded on public policy "that the good it accomplishes in protecting the rights of the general public outweighs any wrong or injury which may result to a particular individual"); *Zarate v. Cortinas*, 553 S.W.2d 652, 654 (Tex. Civ. App.—Corpus Christi 1977, no writ) (absolute privilege applies to conduct that otherwise would be actionable "because the defendant is acting in furtherance of some interest of social importance which is entitled to protection even at the expense of uncompensated harm to the plaintiff's reputation"). An absolute privilege for statements made in judicial proceedings is "based on the policy of protecting the judicial process," *Briscoe v. LaHue*, 460 U.S. 325, 334, 103 S. Ct. 1108, 1115 (1983) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 439, 96 S. Ct. 984, 999 (1976) (White, J., concurring)), particularly from "intimidation and self-censorship," *id.* at

341–42, 103 S. Ct. at 1119. *See also* RESTATEMENT (SECOND) OF TORTS ch. 25, topic 2, tit. B, intro. note (1977) (absolute privileges exist to protect persons in limited circumstances when law wants individuals to "be as free as possible from fear that their actions in that position might have an adverse effect upon their own personal interests."). "The administration of justice requires full disclosure from witnesses, unhampered by fear of retaliatory suits for defamation." *James v. Brown*, 637 S.W.2d 914, 917 (Tex. 1982). And because the administration of justice is a process that encompasses more than simply judicial proceedings, the absolute privilege reaches statements made preliminary to a proposed judicial proceeding, as well as informal complaints made to a prosecuting attorney or other proper officer preliminary to a proposed criminal prosecution. RESTATEMENT (SECOND) OF TORTS § 587. An individual speaker who makes a defamatory statement "may not deserve the privilege, nevertheless, the law grants the privilege to protect the integrity of the process." *Attaya v. Shoukfeh*, 962 S.W.2d 237, 239 (Tex. App.—Amarillo 1998, pet. denied); *accord Hernandez v. Hayes*, 931 S.W.2d 648, 654 (Tex. App.—San Antonio 1996, writ denied) ("The absolute privilege is as much a protector of the *process* as it is a protector of those who avail themselves of the process.").

**B.  Absolute privilege encourages cooperation, which aids enforcement efforts**

Absent an absolute privilege, the threat of liability may deter a company from fully cooperating in an FCPA investigation. When a corporation accepts some fault for its conduct, it is necessarily attributing the fault to individuals who are its agents, officers, or employees. Thus, a corporation's frank acceptance of its fault, by its very nature, will often result in some individuals within the company disagreeing with that assessment. If the identified individuals and entities may sue for defamation, a company will have a disincentive to cooperate and accept responsibility. If absolute privilege is not available, a cooperating party runs the risk of defamation actions by anyone identified as having involvement in a potentially prohibited transaction. This risk creates a disincentive for companies to conduct their own investigations, to make frank assessments of fault, and to communicate findings to the DOJ.

Without corporate cooperation, more of the burden of the investigation shifts to the government, requiring the DOJ to piece together knowledge and understanding that the company already has from its involvement in the transaction. The DOJ may have to use formal judicial processes to obtain documents and testimony and then invest additional effort to review the information and ascertain its relevancy, when the corporation easily could identify and assimilate the key documents and important transaction details. And some

information is difficult to obtain without an inside perspective—corporations fearful of defamation liability may be reluctant even to identify those responsible for certain decisions, and the decision-maker on paper is not always the decision-maker in practice. Thus, creating disincentives to full disclosure imposes significantly greater costs on the DOJ and hampers its efforts to investigate FCPA violations.

The detection of foreign corrupt practices, cooperation of persons engaged in such conduct, and deterrence of future violations are all enhanced by creating full incentives for disclosure of information to the DOJ. The extraterritorial aspects of FCPA violations make them costly and time-consuming to investigate. Delayed responses, language barriers, and lack of jurisdiction may hinder the FCPA's enforcement. Cooperation from individuals and companies willing to undertake internal investigations or to assist the DOJ in its efforts can help overcome these obstacles. Recognition of an absolute privilege, therefore, promotes the policy goals underlying the FCPA by aiding law enforcement through increased access to information and efficiency.

To deny absolute privilege here would be to chill the free flow of information and impair the DOJ's ability to conduct its investigations and enforce the FCPA. *See 5-State Helicopters,*146 S.W.3d 254, 259 (Tex. App.—Fort Worth 2004, pet. denied) (stating that adopting "a rule that private citizens'

communications to a quasi-judicial body about a matter that the entity was authorized to investigate and resolve would not be privileged unless and until the proceeding reached the administrative hearing stage . . . would have a chilling effect on the free flow of information and deter rather than aid the decision-making body's efforts to obtain necessary information."); *Attaya*, 962 S.W.2d at 239 (stating that absolute privilege "is intended to protect the integrity of the process itself and to insure that the decision-making body gets the information it needs."). Without incentives to cooperate, enforcement of the FCPA would be curtailed. Robert W. Tarun, *The Foreign Corrupt Practices Act Handbook: A Practical Guide for Multinational General Counsel, Transactional Lawyers and White Collar Criminal Practitioners*, 190 (2nd ed. 2012) (stating that "DOJ and SEC do need companies to voluntarily disclose because their resources are limited."); *see also Examining Enforcement of the Foreign Corrupt Practices Act: Hearing Before the Subcomm. on Crime and Drugs of the S. Comm. on the Judiciary*, 111th Cong. 8 (Nov. 30, 2010) (statement of Greg Andres, Acting Deputy Assistant Att'y Gen., Crim. Div., Dep't of Justice) (stating that, in many cases, DOJ relies on "the self-disclosure and cooperation of corporations" and that self-disclosure is an important factor in cases that get resolved).

The process is thus designed to promote cooperation through incentives such as better settlement prospects and more lenience in the Federal Sentencing

Guidelines, as discussed below. "[The companies] make a decision to disclose and in return for their disclosing and their investigating, in large part, their own criminal conduct, they get meaningful credit with the department and that credit goes into the decision whether to file an information or charge the company, whether to enter a deferred prosecution or non-prosecution agreement." *See* Philip Segal, *Coming Clean on Dirty Dealing: Time for A Fact-Based Evaluation of the Foreign Corrupt Practices Act*, 18 FLA. J. INT'L L. 169, 177 n.28 (2006). These incentives are less effective when offset or overshadowed by the potential for defamation litigation and liability.

**C.  Absolute privilege recognizes the precarious position of corporations involved in questioned transactions**

Absolute privilege also recognizes that companies feel compelled to provide information, often against their own interest and those of their employees, to avoid larger penalties. A company like Shell is, in the face of a DOJ inquiry, in a quandary: it can provide inculpatory statements regarding actions taken on its behalf by its employees, recognizing that it is exposed to a defamation claim. Or it can face criminal prosecution or penalization for a failure to comply and cooperate adequately with the DOJ's investigation. *See, e.g.*, *U.S. v Kay*, 513 F.3d 432, 454–55 (5th Cir. 2007) (affirming FCPA and obstruction of justice convictions against corporate president who failed to disclose documents subpoenaed during SEC investigation and failed to disclose misconduct in testimony given during

investigation).[1] The qualified immunity adopted by the Court protects Shell for all but those statements made with actual malice. But the reason that absolute privilege extends even to malicious untruths is not because such statements are rendered less deserving of protection in the context of a judicial or quasi-judicial proceeding; it is because balancing of the rights at issue in such proceedings demands immunity—i.e., protection against "the danger of even an unsuccessful civil action"—rather than the opportunity to litigate state of mind. *See* RESTATEMENT (SECOND) OF TORTS ch. 25, topic 2, tit. B, intro. note (1977). Encouraging witnesses to share requested information about possible criminal violations with a trained government investigator whose job is to separate fact from fiction should be encouraged—even at the cost of some defamatory statements going without remedy—when a witness does not initiate the investigation and faces prosecution for any false statements. *See Clemens v. McNamee*, 608 F. Supp. 2d 811, 816–17 (S.D. Tex. 2009), *aff'd*, 615 F.3d 374 (5th Cir. 2010). Similarly, Shell's cooperation with the DOJ was essential to lowering its potential liability in fines—either through agreed disposition with the DOJ or in post-trial sentencing—and withholding information could have subjected Shell to federal prosecution. *See* 18 U.S.C. § 1505 (criminalizing, in relevant part, anyone

---

[1] *Kay*, a criminal case, does not discuss whether an absolute privilege applies to statements made during the SEC investigation.

who, "with the intent to avoid, evade, prevent, or obstruct compliance . . . with any civil investigative demand . . . , willfully withholds . . . any documentary material, answers to written interrogatories, or oral testament, which is the subject of such demand"); *Kay*, 513 F.3d at 455 (affirming obstruction of justice conviction for withholding documents and making false statements during FCPA investigation). In the context of an ongoing government investigation, there are enormous risks to maliciously implicating an innocent person in an FCPA violation. The potential consequences to a company like Shell are themselves adequate to protect the interests of Writt and similarly situated employees from malicious defamation.

**D.** **Sound public policy distinguishes between solicited and unsolicited communications**[2]

---

[2] The Restatement goes further, recognizing an absolute privilege for informal complaints made to a prosecuting attorney or similar governmental authority. RESTATEMENT (SECOND) OF TORTS, § 587, cmt. b (providing that absolute privilege applies to "information given and informal complaints made to a prosecuting attorney or other proper officer preliminary to a proposed criminal prosecution whether or not the information is followed by a formal complaint or affidavit"); *id*. § 598 cmt. e ("Formal or informal complaints to a prosecuting attorney or other law enforcement officer concerning violations of the criminal law are absolutely privileged under the rule stated in § 587"). A number of states have adopted this approach. *See e.g., Correllas v. Viveiros*, 572 N.E.2d 7, 11 (Mass. 1991) (statements made to police or prosecutors before trial are absolutely privileged if they are made in context of proposed judicial proceeding); *McGranahan v. Dahar*, 408 A.2d 121, 124 (N.H. 1979) (applying absolutely privilege to complaints and statements to prosecuting authority during pre-arrest investigation because they constitute part of initial steps in judicial proceeding); *Bergman v. Hupy*, 221 N.W.2d 898, 901−02 (Wis. 1974) (applying absolute privilege to statements to assistant district attorney while seeking issuance of criminal complaint); *Block v. Sacramento Clinical Labs, Inc.*, 182 Cal. Rptr. 438, 442−43 (Cal. Ct. App. 1982) (holding that report prepared "upon the request of the office of the district attorney in furtherance of its investigation whether there was

When a criminal investigation is ongoing, the governmental authority—a neutral and objective investigator—has determined that there is some threshold level of evidence or other grounds for suspicion to justify an investigation on the subject matter. In such a circumstance, the allegedly defamatory statements are not the initial cause of the governmental authority's decision to investigate. This lessens, though it does not eliminate, the risk that the speaker's defamatory statements, alone, could spur government action against the defamed party. And when the speaker is approached as a potential target of the investigation, as Shell was here, it may also lessen the efficacy of a speaker's defamatory statements—a governmental authority may treat finger-pointing by suspected lawbreakers with heightened skepticism. Thus, the governmental authority's role as adjudicator of truth and fiction is implicated.

In light of these policies, numerous Texas cases have distinguished between statements that are made pursuant to an ongoing or already contemplated proceeding (which fall within the privilege) and statements that caused or were intended to cause the initiation of a proceeding (which do not fall within the privilege). Although both statements are "preliminary to" a judicial proceeding in a

probable cause to initiate criminal charges" was absolutely privileged because there are strong policy reasons to "assure free and open channels of communication between citizens and public agencies and authorities charged with the responsibility of investigating wrongdoing"). It is unnecessary to decide whether to apply the Restatement prosecutorial privilege here, but many of the reasons for that privilege do apply here, as discussed herein.

14

temporal sense, protection is only provided to the first because it does not cause the criminal investigation or proceeding. *Compare San Antonio Credit Union v. O'Connor*, 115 S.W.3d 82, 99 (Tex. App.—San Antonio 2003, pet. denied) (holding that criminal complaint was not absolutely privileged because "no judicial proceedings had been proposed" when complaint was filed); *Clark v. Jenkins*, 248 S.W.3d 418, 433 (Tex. App.—Amarillo 2008, pet. denied) (holding that absolute privilege was not available when statements were "preliminary in nature—*i.e.*, designed to launch an investigation that might lead to legal action"); *Smith v. Cattier*, No. 05-99-01643-CV, 2000 WL 893243, at *4 (Tex. App.—Dallas July 6, 2000, no pet.) (not designated for publication) (noting that witness's failure to negate that his communication with law enforcement authorities had "initiated, procured, and caused" criminal investigation into plaintiff's actions); *Zarate*, 553 S.W.2d at 655–56 (holding that complaints filed with sheriff's office to initiate criminal investigation into financial improprieties were not entitled to absolute privilege); *Vista Chevrolet, Inc. v. Barron*, 698 S.W.2d 435, 438 (Tex. App.—Corpus Christi 1985, no writ) (declining to apply absolute privilege to criminal theft complaint made to law enforcement authorities), *with Perdue, Brackett, Flores, Utt & Burns v. Linebarger, Goggan, Blair, Sampson & Meeks, L.L.P.*, 291 S.W.3d 448, 453 (Tex. App.—Fort Worth 2009, no pet.) (applying absolute privilege to law firm's statements about competing law firm in memo to city

council before council meeting regarding extension of competing firm's contract with city); *5-State Helicopters*, 146 S.W.3d at 259 (applying absolute privilege to helicopter company's letters to FAA complaining of inspector's actions in course of FAA inspection and investigation); *Shanks v. AlliedSignal, Inc.*, 169 F.3d 988, 994 (5th Cir. 1999) (applying absolute privilege statements made as part of "ongoing" National Transportation and Safety Board accident investigation); *Clemens*, 608 F.Supp.2d at 823–24 (applying absolute privilege to solicited, involuntary statements made to federal prosecutors and investigators and to commission formed by Major League Baseball "as part of an ongoing proceeding").

These distinctions—between who initiated the contact between the speaker and the governmental authority and whether the governmental authority already had cause to investigate—are also important because, among other reasons, a private citizen generally has no legal obligation to investigate, ascertain the truth of, and report on the criminal activities of others. *Cf.* TEX. PEN. CODE ANN. § 38.17−.171 (requiring person to report only two specific categories of offenses under certain circumstances). But when a governmental authority has independently commenced investigatory proceedings and reached out to a private citizen for information, the citizen may be subject to penalization for interfering or failing to cooperate. *See, e.g.*, TEX. PEN. CODE ANN. § 37.09(a)(1), (c) (West Supp.

2011) (prohibiting person who is aware of investigation or official proceeding from concealing "any record, document, or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding" and "making such conduct punishable" as third degree felony or higher); 18 U.S.C. § 1505 (prohibiting obstruction of proceedings before federal departments, agencies and committees, with penalties including fine and imprisonment). And, with respect to FCPA investigations and prosecutions, the DOJ has informed corporate citizens like Shell that a "corporation's timely and voluntary disclosure of wrongdoing and its willingness to cooperate in the investigation of its agents" is one of the factors the DOJ considers when "conducting an investigation, determining whether to bring charges, and negotiating plea agreements." *See* Deputy Attorney General's *Federal Prosecution of Corporations* (June 16, 1999), *available at* www.justice.gov/criminal/fraud/documents/reports/1999/charging-corps.PDF, last accessed on June 20, 2013. Moreover, if the matter is not resolved with the DOJ and proceeds to trial, the Federal Sentencing Guidelines dictate that the timing and nature of a corporation's cooperation and self-reporting to the DOJ or other appropriate governmental authority be taken into account in setting fines. *See* U.S.S.G. § 8C2.5.

It is therefore not surprising that several federal courts have concluded that statements made as part of an ongoing criminal investigation are entitled to an

17

absolute privilege under Texas law. *See Clemens*, 608 F. Supp. 2d at 824 ("[Assistant U.S. Attorney] Parrella's investigation, much like the NTSB's investigation at issue in *Shanks*, was an ongoing proceeding."); *Shanks*, 169 F.3d at 993–94 (holding that, under Texas law, "NTSB accident investigations are quasi-judicial proceedings, from which it would follow that any communications made during such investigations are absolutely immune from suit"). In the same vein, the Texas Supreme Court applied an absolute privilege in a defamation case based on a letter written to a grand jury foreperson charging a violation of the criminal law in *Hott v. Yarbrough*, 245 S.W. 676, 678−79 (Tex. 1922).

E.     **Conclusion on policy analysis**

Whether to recognize an absolute privilege or qualified privilege is based upon public policy considerations that "treat[] the ends to be gained by permitting defamatory statements as outweighing the harm that may be done to the reputation of others." RESTATEMENT (SECOND) OF TORTS ch. 25, title B, introductory note (1977); *cf. Harlow v. Fitzgerald*, 457 U.S. 800, 813, 102 S. Ct. 2727, 2736 (1982) (stating that "[t]he resolution of immunity questions inherently requires a balance between the evils inevitable in any available alternative").The balancing of these interests is difficult and reasonable minds can disagree about the weight to be given to each interest and the impact of recognizing—or refusing to recognize—privileges for defamatory statements.

On the one hand, there are societal and individual costs associated with giving Shell an absolute privilege—Writt will lose his right to file a lawsuit accusing Shell of defamation. Shell has an incentive to blame lower level employees, who are less capable of defending themselves. So its statement has characteristics of both instigation and self-reporting in response to a formal request for disclosure by a prosecuting authority. As a potential target, Shell's investigation of its own employees may not be entirely independent or objective.

On the other hand, balanced against the individual's interest in protecting his reputation are a number of important societal factors implicated by an FCPA investigation. Statements made in response to a request by the DOJ as part of an FCPA investigation are analogous to statements solicited by prosecutors as part of their investigation. Courts have made a policy decision that complaints to prosecutors are entitled to an absolute privilege even when they are false and malicious. Such protection encourages reporting. Moreover, the prosecutors themselves, as part of their investigation, examine the speaker's motivations. And if the prosecutor determines that statement is false and malicious, the harm created by the statement is limited to a particular audience and is minimized.

A statement that contains a malicious misstatement may materially advance the prosecutor's investigation by revealing an effort to deflect blame and thus implicating the speaker's own culpability and leading to the discovery of other

important facts. And investigations of events occurring overseas involving multiple parties may well result in disagreements on the facts, and thus increase the potential for error. Opening the door to defamation lawsuits that permit the factfinder to second-guess the speaker's motivation may well lead to intolerable self-censorship and might dissuade a timorous corporation from freely stating its view of the facts. Self-censorship may be further exacerbated by the potential for damages, presumed or punitive, that exists in FCPA investigations. Certainly the individual's right to the protection of his own good name is important, but when a statement is only published to one audience—an audience that is under a duty to investigate it and determine its accuracy, as the DOJ is charged—and is done so at that agency's request, it is necessary to protect some false statements made with malice in order to protect other speech that public policy strongly seeks to encourage. Self-reporting in response to a criminal probe should be fostered as good policy, and there is some confidence in the truthfulness of the statements made in connection with these sorts of reports, because false statements could subject the speaker to further criminal liability.

I believe that merely granting a qualified privilege does not properly balance these interests here. A qualified privilege requires a determination that the speaker acted in good faith, a subjective inquiry that will often require a jury. The combination of the broad powers granted both in law and in practice to the DOJ in

investigating and resolving FCPA matters and the DOJ's solicitation of Shell's cooperation in its ongoing investigation lead me to conclude that public policy is best implemented by securing "the utmost freedom" for Shell to respond and provide information to the DOJ. *Cf*. RESTATEMENT (SECOND) OF TORTS § 585 cmt. c (primary purpose of granting absolute privilege for statements by judges is to give them "the utmost freedom" in performing their tasks); *id*. § 587 cmt. a (absolute privilege granted to parties to judicial proceedings is "based upon the public interest in according to all men the utmost freedom of access to the courts"). Shell's role in providing evidence in connection the investigation is of "fundamental importance in the administration of justice. The final judgment of [the DOJ on whether to prosecute a possible FCPA violation] must be based on the facts as shown by [its statements], and it is necessary therefore that a full disclosure not be hampered by fear of private suits for defamation." RESTATEMENT (SECOND) OF TORTS § 588 cmt. a. As part of its determination, the DOJ—much like a jury—attempts to separate fact from fiction. *Briscoe*, 460 U.S. at 335, 103 S. Ct. at 1115 (quoting *Imbler*, 424 U.S. at 439, 96 S. Ct. at 999 (White, J., concurring)) (noting that courts' ability "to separate truth from falsity, and the importance of accurately resolving factual disputes in" judicial proceedings warrant absolute privilege in order to give witnesses "every encouragement to make a full disclosure of all pertinent information within their knowledge."). The DOJ's prosecutorial

role requires it to remain neutral and objective in analyzing the evidence presented to it, again much like a jury or factfinder. *See Berger v. United States*, 295 U.S. 78, 88 (1935). Finally, the DOJ even offers inducements to companies like Shell to cooperate in the form of credits used in its settlement formula. Here, the DOJ began its own investigation and solicited Shell's cooperation, and I believe these policies warrant encouraging such cooperation through an absolute privilege.

**Shell's statements were made in contemplation of judicial proceedings**

The Court correctly identifies the principal legal issue here: whether Shell's statements to the DOJ were made preliminary to or in serious contemplation of a judicial proceeding and are thus absolutely privileged. The Court holds that Shell's statements do not fit within the judicial proceedings privileges, concluding instead that the statements are more in the nature of an unsolicited criminal complaint and thus not entitled to absolute privilege. Although it is undisputed that Shell's statements here were not made *during* a judicial proceeding, I agree with Shell that its communications to the DOJ were made *in contemplation of* a judicial proceeding—the criminal prosecution that the DOJ did in fact initiate.

The judicial privilege applies to statements made in judicial proceedings when the statement satisfies three elements: (1) the contemplation of or existence of a proceeding (2) that is judicial or quasi-judicial in nature and (3) related to the statements. *See Perdue, Brackett, Flores, Utt & Burns*, 291 S.W.3d at 452. With

respect to the first element, the privilege extends not only to statements in the formal proceeding itself but also to statements made before a proceeding is formally commenced if a proceeding is contemplated, proposed, or in its preliminary stages. *See Perdue, Brackett, Flores, Utt & Burns*, 291 S.W.3d at 452; *5-State Helicopters*, 146 S.W.3d at 257 (stating that absolute privilege applies to "communications made in contemplation of or preliminary to a quasi-judicial proceeding"); *Watson v. Kaminski*, 51 S.W.3d 825, 827 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (stating that "absolute privilege includes communications made in contemplation of and preliminary to judicial proceedings"); *see also* RESTATEMENT (SECOND) OF TORTS § 588 cmt. e (stating that, in regard to communications preliminary to "proposed judicial proceeding," absolute privilege applies "when the communication has some relation to a proceeding that is actually contemplated in good faith and under serious consideration by the witness or a possible party to the proceeding," and that "bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered"). The "preliminary to" a judicial proceeding test is applied to lawyers, witnesses, and potential parties in contemplated judicial (and quasi-judicial) proceedings. RESTATEMENT (SECOND) OF TORTS §§ 586 & cmt. a, 588 cmt. e.

Relying on the "preliminary to" language in section 587 of the Restatement, Shell points out that the DOJ ultimately filed a criminal proceeding against Writt and therefore contends that its statements were preliminary to a judicial proceeding. Relying on the "contemplated proceedings" language found in comment e to section 588 and a number of Texas cases, Writt responds that Shell must prove that either the prosecuting authority had a subjective intent to file charges at the time the statements were made—i.e., that the DOJ "actually planned" to file criminal charges at the time of Shell's statements—or that, objectively, the prosecuting authority "had sufficient information to initiate criminal proceedings" before the statement was made. Writt contends that a criminal proceeding initiated seventeen months after Shell's communication does not satisfy this burden.

The Restatement's alternative formulations of the test that expand absolute privilege from judicial proceedings to matters preliminary to judicial proceedings include two components: (1) a temporal component that focuses on the timing of the statements (the "preliminary to" statement of the rule) and (2) a subjective component that focuses on whether a speaker or a possible party to the proceeding contemplated a proceeding at the time the statements were made (the "in

24

contemplation of" statement of the rule).[3] *See, e.g.*, *Bell v. Lee*, 49 S.W.3d 8, 11 (Tex. App.—San Antonio 2001, no pet.) (applying judicial privilege when writer was contemplating future litigation at time of allegedly defamatory letter); *Watson*, 51 S.W.3d at 827 (applying absolute privilege to attorney's letter offering not to bring similarly situated parties' claims against company in exchange for payment because letter contemplated suit if payment was not made); RESTATEMENT (SECOND) OF TORTS § 588 cmt. e (stating that preliminary to "proposed judicial proceeding" prong of inquiry is satisfied "when the communication has some relation to a proceeding that is actually contemplated in good faith and under serious consideration by the witness or a possible party to the proceeding"). Thus, the fact of a subsequent proceeding does not, alone, establish when the speaker or possible party first contemplated the proceeding; the speaker may have contemplated the proceeding only after the allegedly defamatory statements. *See, e.g.*, *Hurlbut*, 749 S.W.2d at 764 (declining to apply absolute privilege even though parties allegedly defamed were ultimately arrested and imprisoned). Conversely, the absence of a formal proceeding does not establish that a speaker did not seriously contemplate such a proceeding at some point. *See, e.g.*, *Bell*, 49

---

[3] The contemplation component of absolute privilege is normally invoked by a speaker who is the party (or the party's attorney) initiating the proceedings, such as a district attorney or a plaintiff in civil litigation. But there is no good reason that the rule should not also apply to speakers who are potential defendants in a proceeding and speak to the party conducting the investigation.

S.W.3d at 11 (applying privilege even though litigation contemplated at time of letter was not ultimately initiated).

Relying on *San Antonio Credit Union v. O'Connor*, Writt contends that Shell's evidence proved only an active DOJ "investigation," not an actual or planned "proceeding," which is not sufficient to invoke the privilege. *See* 115 S.W.3d at 99 (stating that "an investigation into criminal activity does not amount to a 'proposed judicial proceeding.'"). The court in *San Antonio Credit Union* stated, in the context of a statement made to a prosecuting authority, that "[a] judicial proceeding would only be 'proposed' when the investigating body found enough information either to present that information to a grand jury or to file a misdemeanor complaint." *Id.*

I would not follow *San Antonio Credit Union*—which is not binding on this Court—for three reasons. First, the court's definition of when a proceeding is "proposed" is not founded in the case law, could only apply to proposed "judicial" proceedings, not "quasi-judicial" proceedings, and would necessarily exclude prosecutions under the FCPA, which are pursued without a grand jury or misdemeanor complaint. *See id.* Second, *San Antonio Credit Union* ignores the distinction made by other Texas cases between absolutely privileged statements that are made pursuant to an ongoing or already contemplated proceeding and

qualifiedly privileged statements that caused, or were intended to cause, the initiation or contemplation of a proceeding.

Third, the absolute privilege defense is designed to encourage a speaker to freely communicate. In the civil litigation context, a potential plaintiff who speaks before the litigation commences knows his or her intent—whether he or she intends to file a lawsuit—but in the criminal context the speaker who is a potential defendant cannot know the intent of the prosecuting authority. Nor is the speaker privy to all the information gathered by the prosecuting authority such that the speaker could attempt to assess whether probable cause to commence a criminal prosecution existed at the time. In order to provide assurances to a speaker—the reason for recognizing immunity in the first place—the contemplation test in the criminal context should not focus on the subjective intent of, or objective proof available to, the prosecuting attorney; rather, it should focus on the speaker's subjective mental state. And when the criminal investigation is not initiated by the speaker and the speaker is responding to an inquiry by a prosecutor about the potential criminal misconduct, I would hold that the speaker as a matter of law contemplates judicial proceedings.

For all of these reasons, I would hold that Shell's communications to the DOJ were made in relation to judicial proceedings that were contemplated at the time of the communications and thus are absolutely privileged.

**Shell's communications to the DOJ were made as part of a
quasi-judicial proceeding**

An absolute protection also protects statements made as part of, or preliminary to, a quasi-judicial proceeding. I would alternatively hold that Shell's statements were made as part of a quasi-judicial proceeding.[4]

A governmental entity has quasi-judicial power if it has the power and authority to investigate and "draw conclusions from such investigations." *Parker v. Holbrook*, 647 S.W.2d 692, 695 (Tex. App.—Houston [1st Dist.] 1982, writ denied); *see also Perdue, Brackett, Flores, Utt & Burns*, 291 S.W.3d at 453 (quasi-judicial power includes the power to investigate and decide issues); *Clark*, 248 S.W.3d at 431 (same). The policies for extending absolute privilege to quasi-judicial proceedings are virtually identical to those for judicial proceedings: (1) citizens should have the unqualified right to communicate with decision-making governmental agencies without the fear of civil litigation and (2) the administration of justice will be better served by full disclosure from witnesses who are not

---

[4] Although Shell contends that its statements were in contemplation of judicial proceedings and focuses on whether "the important public policy considerations underlying the absolute privilege for judicial proceedings" apply here, it also argues that the evidence demonstrates that the DOJ investigation "would . . . satisf[y]" the elements of a quasi-judicial proceeding. We may consider whether the DOJ's investigation constitutes a quasi-judicial proceeding because Writt raised the issue in its original appellant's brief, Shell addressed it as an alternative argument in its brief, and the test used by courts in determining whether a proceeding is quasi-judicial aids in identifying policy considerations that should be considered in the delicate balancing that influences whether an absolute privilege should apply here.

28

deterred by the threat of retaliatory lawsuits for defamation. *See 5-State Helicopters*, 146 S.W.3d at 257; *Darrah v. Hinds*, 720 S.W.2d 689, 691 (Tex. App.—Fort Worth 1986, writ ref. n.r.e.). And, like the courts, executive and administrative agencies with decision-making discretion often have procedures and processes designed to enable them to obtain and sift through information to decipher fact from fiction. Thus, public policy often favors allowing such entities unfettered access to information over restrictions that encourage truthfulness but also limit the information available for the decision-making process. "The absolute privilege is intended to protect the integrity of the process and ensure that the quasi-judicial decision-making body gets the information it needs." *5-State Helicopters*, 146 S.W.3d at 257.

The DOJ's FCPA investigation satisfies most of the elements of quasi-judicial power.[5] The DOJ is statutorily imbued with the duty to prosecute offenses

---

[5] This Court has identified six factors for determining whether a governmental entity is functioning in a quasi-judicial capacity: (1) whether it has the power to exercise judgment and discretion; (2) whether it has the power to hear and determine or to ascertain facts and decide; (3) whether it has the power to make binding orders and judgments; (4) whether it has the power to affect the personal or property rights of private persons; (5) whether it has the power to examine witnesses, to compel the attendance of witnesses, and to hear the litigation of issues on a hearing; and (6) whether it has the power to enforce decisions or impose penalties. *Parker*, 647 S.W.2d at 695. Other courts have also adopted these six factors. *See, e.g.*, *Perdue, Brackett, Flores, Utt & Burns*, 291 S.W.3d at 453; *Fiske v. City of Dallas*, 220 S.W.3d 547, 551 (Tex. App.—Texarkana 2007, no pet.); *Alejandro v. Bell,* 84 S.W.3d 383, 391 (Tex. App.—Corpus Christi 2002, no pet.). A governmental agency "need not have all of the above powers to be considered quasi-judicial, but certainly the more of these powers it has, the more

against the United States. *See* 28 U.S.C. § 547 (2006). With respect to the FCPA, the DOJ is given wide latitude in establishing and carrying out the procedures by which violations are investigated and prosecuted and in determining what and when to investigate or prosecute. *See* 15 U.S.C. § 78dd-2, -3; *see also Clayco Petroleum Corp. v. Occidental Petroleum Corp.*, 712 F.2d 404, 409 (9th Cir. 1983) (observing that DOJ has "discretion" in bringing enforcement actions and "[t]herefore, any governmental enforcement represents a judgment on the wisdom of bringing the proceeding, in light of the exigencies of foreign affairs"). The DOJ's authority includes the authority to investigate the facts, draw conclusions about whether prosecution is appropriate, and determine what penalties and conditions to impose in any settlement. *See* 28 U.S.C. §547; 15 U.S.C. § 78dd-2, -3. U.S. Attorneys have the authority to settle FCPA claims asserted by United States. 28 C.F.R. §§ 0.160, 0.161. Additionally, the DOJ is authorized to issue opinions as to whether a prospective transaction would violate the FCPA. *See* 28 C.F.R. §§ 80.1, *et seq.* The DOJ also has the power to examine witnesses and to compel the production of witnesses and other evidence. *See* 15 U.S.C. § 78dd-3(d)(2).

To the extent that the DOJ's investigative powers under the FCPA do not meet every element of the criteria for defining a quasi-judicial proceeding, that is

clearly is it quasi-judicial in the exercise of its powers." *See Parker*, 647 S.W.2d at 695; *see also Hernandez*, 931 S.W.2d at 651; *Shanks*, 169 F.3d at 994.

primarily because the DOJ's determinations must ultimately be either proven in court or resolved through an agreement approved by a court. And that failure is not enough to disqualify the DOJ from acting in a quasi-judicial manner because, while "[a] governmental entity's power to decide a controversy presented by an allegedly defamatory statement is a key factor in determining whether the defamatory statement relates to the exercise of quasi-judicial power," it is not a necessary element. *See Perdue, Brackett, Flores, Utt & Burns*, 291 S.W.3d at 452.

Thus, even without the power to make final decisions, an agency proceeding may be deemed quasi-judicial when a statute confers upon the agency "the power to conduct investigations and hearings." *Reagan*, 166 S.W.2d at 913. The DOJ meets this test because it has the power to conduct investigations and here summoned Shell to meet and provide documents.

The absence of final decision-making authority was not conclusive in *Putter v. Anderson*, 601 S.W.2d 73, 77 (Tex. Civ. App.—Dallas 1980, writ ref'd n.r.e.). The court there concluded that the police department's internal affairs division exercised quasi-judicial power because it could investigate complaints received, determine whether the complaints were justified, and then make recommendations to the police chief or a disciplinary board for discipline. *Id.* The internal affairs division was not required to be empowered to mete out punishments itself in order

to act in a quasi-judicial capacity. *Id.* The DOJ's authority under the FCPA is at least as great as that of the internal affairs division in *Putter*. *Id.*

Moreover, Shell met its burden of demonstrating that the statements were made during a quasi-judicial proceeding by presenting uncontroverted evidence that, although the DOJ had not yet initiated formal judicial proceedings directed at Shell at the time of Shell's statements, the DOJ had initiated formal judicial proceedings against other entities with whom Shell did business in connection with the questioned transactions and had initiated its own informal inquiry of Shell. Therefore quasi-judicial proceedings—proceedings which are often the only and final proceedings for FCPA violations—against Shell had commenced regardless of whether it had determined that formal judicial proceedings would be necessary. Specifically, Shell has presented evidence of the following facts about the DOJ's activities relating to potential FCPA violations by Shell and its employees during Shell's Bonga project in Nigeria:

- In February 2007 Vetco, an oil-field-services company that was a Shell contractor on the Bonga project, entered into a criminal plea agreement in which it agreed to pay a $26 million fine for illegally bribing Nigeria officials through a forwarding and customs clearance company.

- Before contacting Shell, the DOJ had begun investigating Panalpina, an investigation that eventually revealed that Vetco made its bribery payments to Nigerian custom officials through Panalpina for the purpose of facilitating the importation of materials for the Bonga project.

- Less than six months later, in July 2007, the DOJ's Criminal division, fraud section, informed Shell that it had "come to [the DOJ's] attention that [Shell]

has engaged the services of Panalpina, Inc.," a freight forwarding and customs clearing agent for Vetco, and "that certain of those services may violate the [FCPA]." In the letter, the DOJ requested a meeting with Shell in the DOJ's Washington, D.C. office to discuss the matter and requested that Shell collect certain date to provide to the DOJ at the meeting.

- Shell agreed during the meeting to investigate its dealings with Panalpina and to produce documents and information to the DOJ including information about Writt, who was a project manager responsible for approving reimbursement requests on the Bonga project and understood that the DOJ would conduct its own investigation for possible FCPA violations by Shell and its employees.

- In its July 17, 2007 letter, the DOJ specifically requested that Shell produce documents and information relating to Writt.

- Shell began its investigation in August 2007, using outside counsel, in-house counsel, accountants from KPMG, former FBI agents, and former law enforcement officers, and interviewing Writt during that month.

- Shell's investigation culminated in its February 5, 2009 report entitled Nigerian Customs Issues on the [Shell's] Bonga Project and in the Temporary Importation of Vessels into Nigerian waters "with the understanding that [it] would be treated confidentially."

- Shell Nigeria entered into a deferred prosecution agreement in November 2010 in which it acknowledged responsibility for its employees engaging in conduct violating the anti-bribery provision of FCPA. The terms of the agreement specifically state that the DOJ entered into this agreement in part because Shell Nigeria "cooperated with" the investigation, undertook remedial measures, "agreed to continue to cooperate with . . . any ongoing investigation" by the DOJ into potential violations of FCPA, and agreed to a $30 million fine.[6]

---

[6]  Shell's evidence with respect to the DOJ's investigation and settlement of the FCPA case against Shell is largely uncontroverted. In his response to Shell's motion for summary judgment, Writt addressed Shell's privilege defense primarily on legal grounds. The only evidence he cited in this regard—an expert affidavit from a law professor who previously worked at the DOJ—related to whether the DOJ had "the final word on whether a crime ha[d] occurred."

For all of these reasons, Shell's communications to the DOJ were made in contemplated or ongoing quasi-judicial proceedings and should be afforded the same privilege.

## Conclusion

The issue here is of extraordinary importance to the many international companies in Texas that face FCPA inquiries from the DOJ. Absolute privilege is recognized in limited circumstances because it creates a bright-line rule upon which witnesses may depend, thereby incentivizing witnesses to make expressions that may serve important public interests without fear of being subjected to civil litigation. Shell's statements here did not trigger or instigate a criminal investigation; they were part of Shell's communication to the DOJ reporting the results of its internal self-investigation and information gathering, spurred by the DOJ's request for information and cooperation in its ongoing investigation to determine whether and whom to prosecute for violations of the FCPA. As such, they should be, and I believe under existing law are, absolutely privileged.

I therefore respectfully dissent.

Harvey Brown
Justice

Panel consists of Justices Jennings, Sharp, and Brown.

Justice Brown, dissenting.